Opinion by Judge Reinhardt; Dissent by Judge Bybee
REINHARDT, Circuit Judge.
I.
This case presents the question whether a state prisoner who contends that he is actually innocent, but whose principal witness is coerced by the state into not testifying on his behalf, may pursue his federal constitutional claims in federal court notwithstanding his failure to comply with all of the applicable procedural prerequisites. Roger Smith is currently serving a life sentence with a 30-year minimum term. The district court dismissed on procedural grounds his petition for a writ of habeas corpus without reaching the merits of his claims. It found that he had not exhausted those claims in state court and that, because state procedural rules barred him from doing so now, the claims were procedurally defaulted. Like the district court, we do not consider the merits of his case. All we decide is that, under an exception to the applicable procedural rules, Smith may pursue his federal constitutional claims in federal court. Both the facts and the law are complex, however, as they tend to be these days in almost all habeas corpus cases.
Smith argues on this appeal that his petition has not been procedurally defaulted and that, if it has, the procedural default should be excused on the basis of his claim of actual innocence. The exception on which he relies is known as the Schlup “actual innocence” exception, named after the case of Schlup v. Delo, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). We hold that because prosecutorial misconduct in connection with his federal habeas proceedings seriously interfered with *807 Smith’s ability to make the necessary showing under Schlup, and because the resultant harm cannot be effectively remedied by less intrusive means, the exculpatory testimony withheld from the court as a result of the state’s actions must be presumed to be true. We deem the exculpatory statements to be truthful, however, only for the purpose of determining whether Smith’s contentions are sufficient to excuse any procedural default that may have occurred; we do not consider here what remedy would be appropriate with respect to his subsequent efforts to establish any claim on the merits that might entitle him to relief, including any claim of actual innocence.
In short, we conclude only that, affording the disputed witness statements the benefit of the presumption of truthfulness, Smith satisfies the Schlup “actual innocence” standard for overcoming a procedural default of his claims insofar as they relate to his felony murder conviction, and nothing more. As we explain below, Schlup is satisfied here, and thus Smith is entitled to proceed with his constitutional claims, not simply because the evidence at this point would likely preclude any reasonable juror from determining that he was the actual killer, but because that evidence would more likely than not cause any such juror to conclude that he had established, by a preponderance of the evidence, an affirmative defense to the felony murder charge under Oregon law. Accordingly, we reverse the district court and remand so that Smith may be afforded a hearing on the merits of his constitutional claims.[1]
II.
On April 3, 1989, two young men, Smith and Jacob Edmonds, burglarized and robbed the home of Emmett and Elma Konzelman. A third man, Marlin Bouse, drove with them to the Konzelmans’ home, but decided not to participate further in the criminal activity after initially entering the garage. Although there was no indication that the two who entered the house itself had planned to injure anyone, one of them, when out of the presence of the other, attacked the Konzelmans in their bedroom and bludgeoned Mr. Konzelman to death. Mrs. Konzelman, who survived the assault, told police that only one of the burglars had attacked the couple and that no one else entered the room at that time or saw the killing. There is no dispute that either Smith or Edmonds alone committed the murder. The ultimate question is which one.
There is substantial evidence in the record to suggest that Edmonds murdered Mr. Konzelman and that he committed the killing outside of Smith’s presence and without any advance knowledge on Smith’s part that he would engage in any violent conduct or that he possessed a dangerous or deadly weapon. The blood on the getaway truck and Mrs. Konzelman’s recollection of the killer’s attire, for instance, point to Edmonds as the killer.[2] However, as *808 part of a deal with the prosecutor, Edmonds named Smith as the murderer in return for the dismissal of his murder charges. The conditions of the plea agreement required Edmonds to pass a polygraph examination showing that all of his allegations were truthful and to give a complete statement memorializing his accusation against Smith. In return, the state agreed to recommend concurrent sentences with a minimum of 43 months on the two robbery counts to which he pled.[3]
After learning that he would be prosecuted for capital murder and that Edmonds was going to testify against him, Smith, who had continuously asserted his innocence, pled no contest to robbery and felony murder. In return, he received a life sentence with a minimum term of 30 years. Although Smith pled no contest to the lesser charge of felony murder, the trial judge explained that he was enhancing Smith’s sentence because he believed that Smith was the one who had committed the killing, even though the evidence was far from clear on this point. After the plea, Smith filed a direct appeal, which the Oregon Court of Appeals and the Oregon Supreme Court denied without opinion.
Smith then filed a petition for post-conviction relief in state court, setting forth claims that (1) his trial counsel was constitutionally ineffective because his lawyer coerced his plea agreement without advising him of or pursuing an affirmative defense to felony murder; (2) his due process rights were denied when Edmonds’s plea bargain wrongfully implicated him; and (3) his due process rights were violated because the effect of his medication and his trial counsel’s coercion rendered his no contest plea unknowing and involuntary. The state post-conviction judge denied Smith’s request to appoint new counsel and ruled against him on the merits.
New counsel was appointed on appeal, but Smith did not appeal the denial of his post-conviction claims and argued only that replacement counsel should have been appointed at his first post-conviction hearing. The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. As a result of this appeal, Smith never presented his substantive post-conviction claims to the state supreme court and they remain unexhausted.
In a notarized statement to the district attorney seven years after the incident and two years after the Oregon Supreme Court’s denial of review, Edmonds recanted his earlier testimony against Smith, implicitly acknowledging that he had murdered Mr. Konzelman. Edmonds explained that although he “stated in a sworn statement that Roger Smith ... had in fact bludgeoned Emmit Konzleman [sic] to death,” he wanted “for the record [to] retract that statement. Roger Smith did not kill Emmit Konzleman [sic].” He then confessed to committing perjury in his statement against Smith and explained that “the only way for me to set the record straight is to write this confession now.”
Based on Edmonds’s recantation, Smith again requested post-conviction relief in state court. Smith’s second petition asserted that Edmonds’s 1996 recantation was new evidence that exculpated him and that his due process rights were violated both when the differences between aggravated murder and felony murder were not *809 explained to him at the time of his plea and when the court failed to provide him with an adequate explanation of the charges against him, given that he was on drugs and of below-average intelligence. The court, however, granted summary judgment for the state, concluding that “post-conviction is not the for[u]m to— won’t allow this relief here on newly discovered evidence.” Smith appealed but grew frustrated with his attorney and with the delay caused by numerous extensions of time. As a result, he filed a motion for voluntary dismissal, which the court granted. Smith next turned his attention to the federal courts: In 1997, Smith asserted four grounds for relief in a petition for federal habeas corpus: (1) conviction obtained by a guilty plea which was unlawfully induced and made neither voluntarily nor intelligently; (2) denial of effective assistance of counsel during the investigative and trial preparation stages; (3) denial of effective assistance of counsel during the plea negotiation/ entry stage; (4) denial of effective assistance of counsel during hearings before the trial court.
Amidst the federal habeas proceedings, Edmonds again recanted his statements against Smith in a sworn affidavit. This time, Edmonds’s declaration even more strongly inculpated himself and exculpated Smith as the actual killer: “I know that Mr. Smith did not bludgeon or otherwise strike Mr. Konzleman [sic] and I know that Mr. Smith never entered the Konzleman’s [sic] bedroom, where the killing occurred.” Edmonds also explained that “[a]s a part of my plea agreement in the underlying case, I was required to take a polygraph concerning the murder and I was told that I neither passed [n]or failed that test but that the results were inconclusive.” By these statements, Edmonds largely discredited his initial testimony, in which he had labeled Smith as the attacker.
On the basis of the second recantation by Edmonds, Smith amended his petition adding two additional claims: (5) that he is actually innocent of felony murder and his conviction violates his right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment; and (6) that his federal due process rights were violated under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the prosecution made a deal with the actual murderer and suppressed evidence tending to exculpate Smith.
After Smith added his new claims, the state for the first time turned over a copy of Edmonds’s polygraph results from 1989, even though Smith’s trial counsel had specifically requested the document before Smith’s plea. The 1989 polygraph examination consisted of a few questions, which included whether Edmonds “st[ruek] either of the people in the house on South Shore Drive” and whether he was “lying about anyone else’s involvement in this event.” Edmonds answered “no” to both questions. The evaluator concluded that although “[i]t is the opinion of this examiner that ... Edmonds answered these questions in a truthful manner, ... the scoring on the Backster Zone Comparison Test Technique is inconclusive.” Taking such test results into account in considering Edmonds’s plea agreement, Smith alleges, and the state does not dispute, that Edmonds failed to satisfy the conditions of his plea agreement. Furthermore, the document was not produced for 14 years, even though it was timely requested and contained exculpatory information.
Smith asserts that the state dramatically accelerated its efforts to suppress exculpatory evidence during the pendency of the federal habeas proceedings. The state threatened Edmonds with the revocation *810 of his guilty plea and the institution of capital murder charges if he insisted on testifying in accordance with his recantations. At the same time, it made Edmonds an offer of immunity with respect to perjury if he would testify on behalf of the state and formally withdraw his recent confessions. To be clear, the record shows that, as a part of its attempt to deter Edmonds from testifying that Smith was innocent, the state informed Edmonds and his newly appointed counsel that if he persisted in recanting his testimony against Smith, the state would seek the death penalty against him. In response to these threats, Edmonds sent a letter to the district judge informing him that he would invoke his Fifth Amendment privilege if called to testify on Smith’s behalf. In reply, Smith contended that the state was engaging in prosecutorial misconduct intended to distort the factfinding function of the court and that, if the court did not grant him the requested habeas corpus relief, it should order an evidentiary hearing at which the government should be compelled to provide Edmonds with immunity.
Almost two years later, the district court ruled that it was unable to reach the merits of Smith’s claims. It held that the claims were procedurally defaulted because of his failure to exhaust them in state court.[4] The district court also found that Smith did not establish either sufficient actual innocence or cause and prejudice to excuse the defaults. It stated, however, that “[a] logical inference” from Edmonds’s refusal to testify in the manner desired by the state, even after the prosecution’s promise of immunity if he would do so, is that “if Edmonds did testify truthfully, he would say that Smith did not kill Emmitt [sic] Konzelman, and implicate *811 himself as the killer.” Nevertheless, it rejected Smith’s suggestion that Edmonds be granted immunity under United States v. Westerdahl, 945 F.2d 1083 (9th Cir.1991), on the ground that it could not “say that the government’s immunity decision [wa]s so capricious as to constitute an intentional distortion of the factfinding process that warrants judicial intervention.” It then denied Smith’s request for an evidentiary hearing because it believed that a hearing would be futile and would serve no purpose given Edmonds’s refusal to testify — in other words, that in the absence of Edmonds’s exculpatory testimony (which the prosecution had advised Edmonds would cause it to seek his execution), Smith would be unable to overcome the procedural default. Smith now appeals the district court’s procedural default rulings. We have jurisdiction under 28 U.S.C. § 2253.
III.
The petition in this case was filed after April 24, 1996, and is therefore governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Woodford v. Garceau, 538 U.S. 202, 210, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). An appellate court reviews de novo the district court’s decision to deny a habeas petition. Hunter v. Ayers, 336 F.3d 1007, 1011 (9th Cir.2003). This court also reviews de novo a district court’s decision to dismiss a habeas corpus petition for procedural default. Manning v. Foster, 224 F.3d 1129, 1132 (9th Cir.2000). The district court’s interpretation of AEDPA standards governing the grant or denial of an evidentiary hearing is reviewed de novo, Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir.1999), and its ultimate denial of an evidentiary hearing, based on the AEDPA standards, is reviewed for abuse of discretion, Davis v. Woodford, 384 F.3d 628, 638 (9th Cir.2004) (citing Lawson v. Borg, 60 F.3d 608, 611 (9th Cir.1995)). An error of law is, however, an abuse of discretion. Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). The district court’s findings of fact are reviewed for clear error. Bonin v. Calderon, 59 F.3d 815, 823 (9th Cir.1995).
IV.
Although the district court stated that it questioned the adequacy of Oregon’s post-conviction procedures if, as the state post-conviction court held, newly discovered evidence of actual innocence could not serve as a basis for post-conviction relief in Oregon, it declined to decide whether those procedures were in fact inadequate because it concluded that Smith could not, at least in the absence of Edmonds’s testimony, establish that he was actually innocent. We, like the district court, need not decide that question, although for an opposite reason. We conclude that even if there is a default, Smith has, given the procedural determinations we reach below, made the requisite showing of actual innocence necessary to have his claims heard on the merits.[5]
A state prisoner must normally exhaust his available state remedies before a federal court may consider his petition for a writ of habeas corpus. 28 U.S.C. § 2254(b); Rose v. Dandy, 455 U.S. 509, 515, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The Supreme Court has held that if a *812 “petitioner [has] failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,”[6] his claims are procedurally defaulted for purposes of federal habeas review. Coleman v. Thompson, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A petitioner can overcome procedural default and obtain federal review of the merits of his claims either by demonstrating evidence of actual innocence sufficient to bring the defendant within the “narrow class of cases ... implicating a fundamental miscarriage of justice,” Schlup, 513 U.S. at 315, 115 S.Ct. 851 (quoting McCleskey v. Zant, 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)) (internal quotation marks omitted), or by making an “adequate showing of cause and prejudice,” Strickler v. Greene, 527 U.S. 263, 282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Murray v. Carrier, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Because we conclude that, in light of our procedural determinations, Smith has made a showing of actual innocence sufficient to overcome any procedural default with respect to all of his claims regarding his felony murder conviction, we find it unnecessary to decide whether Smith could also make the alternative showing of cause and prejudice with respect to certain of them.
A.
Smith’s procedural default on his constitutional claims will be excused if he can “demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice,” Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), which occurs when a “constitutional violation has probably resulted in the conviction of one who is actually innocent” of the offense that is the subject of the barred claim. Murray, 477 U.S. at 496, 106 S.Ct. 2639; see also Schlup, 513 U.S. at 324, 115 S.Ct. 851. The Supreme Court has described this showing of “actual innocence” as a “gateway” that allows the court to consider otherwise procedurally defaulted claims of constitutional error. See Schlup, 513 U.S. at 315-16, 115 S.Ct. 851 (1995). A Schlup “actual innocence” inquiry is subject to a less stringent standard than a substantive “actual innocence” claim. See Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir.1997) (en banc) (suggesting that “a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent”). This is because passing through the Schlup gateway only permits a federal court to review the underlying constitutional claims; Schlup does not entitle a defendant to a declaration of actual innocence or to any relief outright. Under Schlup, “a petitioner must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.” Schlup, 513 U.S. at 327, 115 S.Ct. 851. In determining whether this showing has been met, the habeas court may consider “all the evidence,” including evidence excluded at trial, admitted illegally, or available only after the trial. Id. at 328, 115 S.Ct. 851. To pass through the procedural gateway, Smith does not need to “show that he is ‘actually innocent’ of the crime he was convicted of committing; instead, he must show that ‘a court cannot have confidence *813 in the outcome of the trial.’ ” Majoy v. Roe, 296 F.3d 770, 776 (9th Cir.2002) (quoting Schlup, 513 U.S. at 316, 115 S.Ct. 851). Although here the conviction was upon a plea of guilty rather than a jury verdict, the inquiry is the same in either case: can we have confidence that the petitioner committed the offense of which he was convicted?
The Supreme Court recently reaffirmed the viability of the Schlup “actual innocence” gateway in House v. Bell, — U.S. -, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In House, the Court emphasized that “the Schlup standard does not require absolute certainty about the petitioner’s guilt or innocence,” but rather requires only that a petitioner demonstrate that it is “more likely than not any reasonable juror would have reasonable doubt” regarding his guilt. Id. at 2077. In doing so, the Court also rejected any suggestion that AEDPA “ha[d] replaced the Schlup standard with a stricter test,” id. at 2078, holding instead that AEDPA’s standard of review is inapplicable to “a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence,” id.
The state charged Smith with felony murder because he committed a burglary and a robbery, and a killing occurred during the commission of those acts.[7] Oregon allows a defendant to prove an affirmative defense to establish innocence of felony murder. OR. REV. S TAT. § 163.115(3) (2003). Smith satisfies Schlup’s actual innocence requirement if he shows that it is more likely than not that any reasonable juror would have had a reasonable doubt as to his guilt in light of the evidence in the district court record, including Edmonds’s affidavits, supporting his affirmative defense. See Jammillo v. Stewart, 340 F.3d 877, 883 (9th Cir.2003) (demonstrating use of affirmative defense for Schlup’s “actual innocence” analysis). At trial, Smith would have been required to prove his affirmative defense only by a preponderance of the evidence. See State v. Counts, 311 Or. 616, 622, 816 P.2d 1157 (1991). Therefore, to pass through the Schlup “gateway,” Smith must demonstrate only that it is more likely than not that no reasonable juror would have found that he had failed to establish the elements of the affirmative defense by a preponderance of the evidence.
In order to establish an affirmative defense to felony murder, Smith must show that he:
(a) Was not the only participant in the underlying crime;
(b) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid in the commission thereof;
(c) Was not armed with a dangerous or deadly weapon;
(d) Had no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon; and
(e) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death.
§ 163.115(3). The state does not dispute that Smith has established the first element. The disagreement is over the last four. As we explain below, because the *814 prosecutor’s misconduct deprived Smith of the benefit of Edmonds’s testimony, we presume Edmonds’s affidavits to be true for purposes of determining whether Smith is procedurally barred from proceeding in federal court. Affording that presumption to 17742 Edmonds’s recantations, we conclude that Smith has presented sufficient evidence to make it more likely than not that any reasonable juror would conclude that he has satisfied all five elements of the affirmative defense to felony murder by a preponderance of the evidence, and that he is “actually innocent” for purposes of Schlup. Thus, Smith may present his substantive habeas claims in the district court.
As to the second element, the evidence demonstrates that it is more likely than not that no reasonable juror would have found that Smith killed Konzelman. Edmonds’s recantations confessing that Smith did not kill Konzelman, which we presume to be true for purposes of this analysis, combined with the testimony of Mrs. Konzelman, which corroborates such recantations in more than one respect, the testimony of Bouse, and the physical evidence lead to the conclusion that Edmonds, and not Smith, was the killer.[8] Although Edmonds has never explicitly confessed that he committed the murder, he has twice sworn that Smith did not kill Konzelman. In his latest affidavit, he said that Smith neither struck Konzelman nor “entered the Konzleman’s [sic] bedroom, where the killing occurred.”[9] Given Mrs. Konzelman’s testimony that the attacker *815 who struck her husband was the only attacker in the bedroom at the time — as the other burglar stood in the doorway briefly and then continued down the hall- — the only reasonable inference to be drawn, assuming Edmonds’s affidavit to be credible, is that Edmonds was the killer. Even the state acknowledged this inference when it stated that “Edmonds has implicitly admitted that he, rather than [Smith], was the killer, [even though] he has never directly admitted as much.”
Further, Edmonds’s initial account of the murder implicating Smith must be viewed with considerable skepticism, even aside from the presumption of truthfulness we afford his subsequent recantations. Edmonds failed to pass the polygraph examination required as part of his plea bargain,[10] and the 17744 consideration he received in exchange for placing the blame on Smith was substantial. That consideration, the district judge observed, “arguably gave him incentive to lie.” Moreover, the mere fact of a subsequent confession in itself raises doubt. The state points to a few instances in which Edmonds’s initial story is corroborated. While it is true that Edmonds may have been able to describe how he avoided the newspaper delivery person while in the garage or how he and Smith went to Smith’s parents’ house shortly after the incident, these descriptions show only that he was present when the crime occurred and are irrelevant to the question whether he or Smith committed the murder in the Konzelmans’ bedroom.[11]
The physical evidence of blood near Edmonds’s area in and on the truck provides strong support for the conclusion that he was the killer. It is clear from the record that Edmonds was the person who actually drove the truck away from the crime scene. The state crime lab found blood only on the areas of the truck that Edmonds, as the driver, would have touched: “the left front part of the hood, the front part of the driver door, the back part of the driver’s door and the ignition area on the interior of the vehicle.” As it is apparent from the record that the scene was quite bloody, the magistrate judge speculated that the blood on the vehicle could be explained by the fact that Edmonds, as he told his jail cellmate, “may have helped wipe down the bloody crowbar.” Particularly in light of his recantations, such statements by Edmonds lack credibility;[12] *816 had he only helped to wipe down the tire iron, that would not explain why all of the blood ended up in his area of the truck.
Mrs. Konzehnan’s testimony regarding the attire of the man who attacked her husband also tends to support the conclusion that Edmonds was the killer. First, Mrs. Konzelman told police that the killer had a skull or stocking cap covering his head. On the night of the incident, Smith wore a hat with a brim, possibly the fedora-style hat that was found outside the Konzelmans’ house. Edmonds described Smith’s hat as “floppy” with “a brim all the way around it”; he called it an “old man hat,” an “old gangster hat,” or a “golf hat.” A fedora, or one of the hats Edmonds described, would have had some sort of brim that distinguished it from the hat Mrs. Konzelman described. Indeed, Mrs. Konzelman specifically noted that the attacker wore a different type of hat from the fedora found near the Konzelman home. Edmonds stated that he wore a baseball cap which, worn backwards, could easily be seen as resembling a skull or stocking cap.
Second, Mrs. Konzelman testified that the attacker was wearing a light-colored jacket, which, because the tags were showing, appeared to be turned inside out. Refuting the state’s suggestion that Smith wore a jacket with fleece lining during the crime, Marlin Bouse — the co-defendant who abandoned the burglary after he, Edmonds, and Smith initially entered the Konzelman’s garage — testified that Edmonds wore a jacket while Smith wore a sweatshirt, which Bouse believed to be red.[13] Bouse further testified that Edmonds and Smith did not change clothing at any point during the night. Edmonds originally tried to evade responsibility for the jacket, but the police found his Levi’s jacket, which had a fleece or wool lining, in the possession of his girlfriend. Although Edmonds asserted, after earlier telling authorities otherwise, that he had loaned his Levi’s jacket to Smith, the magistrate judge who conducted the factfinding was highly skeptical of this claim, noting that Edmonds had confided in a friend that he had lent his jacket to Smith “in an effort to place [Smith] in that jacket.”
Third, Mrs. Konzelman testified that she did not notice gloves on the attacker. As the dissent notes, “it is not entirely clear who wore which gloves.” Dis. op. at 831. Edmonds testified that he wore white latex surgical gloves while Smith wore two black leather gloves; Smith agreed that Edmonds wore latex gloves but claimed that he, Smith, wore either one or two brown leather gloves. No matter whose account is more credible, though, Mrs. Konzelman would have been much more likely to fail to notice translucent latex gloves than either brown or black opaque leather gloves — particularly on a white attacker— which tends to support the conclusion that Edmonds was the killer.
Contrary to the state’s contentions and the magistrate judge’s findings, the remaining evidence does not support the claim that Smith was the killer. For example, simply because black jeans were recovered from Smith’s house and Mrs. Konzelman stated that the killer wore dark or black pants, it does not follow that Smith wore black jeans on the night of the burglary or that Smith was the killer.[14] *817 Indeed, there is nothing unusual about having a pair of dark jeans in one’s house. Moreover, contrary to the magistrate judge’s contention, the code names— “High” and “Low” — attributed to Smith and Edmonds do not demonstrate that Smith was the killer. Mrs. Konzelman told police that the voice of the person yelling “Low” into the phone in the other room was probably not the voice of the killer. It is true that at one point Edmonds claimed that his code name was “High”; therefore, the magistrate judge reasoned that it must have been Edmonds who called out “Low” to Smith. But Edmonds’s claim that he was “High” should be viewed with skepticism, given his later testimony at the sentencing hearing that he could not “recall what the code was” and the fact that he responded affirmatively to the question whether his code name was “High” and Smith’s “Low” only after being told about Mrs. Konzelman’s statement. Furthermore, while maintaining that the person who jerked out the telephone cord was the same person whom she had heard yelling into the phone, Mrs. Konzelman told detectives in a later interview that the person who jerked out the telephone cord was the same person whom she had seen hit her husband. Such statements would seem to contradict her earlier statements that the person yelling into the phone was not the attacker. Any evidence regarding the use of code names appears inconclusive with respect to the identity of her husband’s assailant.[15]
Finally, if Edmonds’s recantations are deemed credible, as we presume them to be, his initial testimony is necessarily false to the extent that it points to Smith and not himself as the actual killer, and lacks any force in countering the other available evidence.[16] Assuming Edmonds’s recantations to be credible, the available evidence shows that it is more likely than not that no reasonable juror would have found that the second element of the affirmative defense — that Smith was not the actual killer' — -had not been established.
As to the third factor of the affirmative defense — whether Smith was armed with a dangerous or deadly weapon — there is no evidence to suggest that anyone other than the killer was so armed. Because the evidence discussed above demonstrates that it is more likely than not that every reasonable juror would find that Edmonds was the only person inside the Konzelmans’ bedroom[17] and was the actual killer, *818 it logically follows that it is more likely than not that Smith was not armed and that no reasonable juror would have found to the contrary.
The dissent argues that Smith cannot satisfy this element of the affirmative defense because he admitted to carrying a rope into the Konzelman residence. Dis. op. at 846-47, 851-52. This argument is concocted out of whole hemp by our creative dissenting colleague. The state wisely does not contend that the rope was a dangerous or deadly weapon; nor does Oregon law support such a contention. Under Oregon law, a “dangerous weapon” is defined as “any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury” and a “deadly weapon” is defined as “any instrument, article or substance specifically designed for and presently capable of causing death or serious physical injury.” Or. Rev. Stat. §§ 161.015(1) & (2) (2003). There is no evidence suggesting that the rope in this case qualified under either of these provisions. Certainly it was not “specifically designed” for the purpose of causing death or serious physical injury. Nor does any evidence in the record suggest that the rope was “used” or “attempted to be used” during the commission of the offense-Mrs. Konzelman testified that she first saw the rope when she got out of bed after the attaek was complete, and after waiting a period to make sure that the intruders were gone from the house. Finally, there is no evidence suggesting that either intruder “threatened” to use the rope, let alone threatened to use it in a manner “readily capable of causing death or serious physical injury.” Indeed, Mrs. Konzelman unequivocally denied that any threats were made in the following exchange with the detectives:
Q: There was something mentioned about a rope.
A: There was a rope there on the floor, but I didn’t see them. They didn’t do anything with it.
Q: OK. Did he, did he threaten to tie you up or anything?
A: No.
Q: Did he say anything about he would, anything to you at all?
A: Not that I can tell you.
Q: OK. There was, I thought that maybe some statements were made earlier about saying something about rolling you over so he could tie you up.
A: No.
The record could not be any clearer on the question whether the intruders used, attempted to use, or threatened to use the rope — plainly, they did not.[18]
Under Oregon law, the question whether an object is a dangerous weapon turns entirely on the circumstances in which it is *819 used, attempted to be used, or threatened to be used. No one doubts that, in certain circumstances, a rope can be used to asphyxiate, and that when it is, it qualifies as a dangerous weapon. This realization, however, is very different from concluding that the rope in this case met Oregon’s definition of a dangerous weapon. It most certainly did not. The cases the dissent cites show how far off-the-mark its conclusion really is. The dissent points to cases finding that a can opener, cowboy boots, or a concrete sidewalk can be a deadly weapon. Again, it all depends on the circumstance — if used to stomp someone to death, cowboy boots might meet the statutory definition; if simply worn while engaged in a fatal fist fight, the boots would not constitute a dangerous weapon. The issue of the rope begins and ends with the fact that Smith did not use, attempt to use, or threaten to use it in any way, let alone in a way that might cause death or serious injury.
The fourth element of the affirmative defense requires Smith to show that he had “no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon.” The district court acknowledged that, at the outset, Smith and Edmonds probably did not intend to kill the Konzelmans. Otherwise, it concluded, “there would be no need to disguise themselves [or] to speak in code names, unless they expected the Konzelmans to survive the intrusion and be capable of giving an account to the police.” Further, the haphazard and unplanned nature of the burglary — during which the burglars ran in and out of the house due to unexpected noises and left several items behind, including Mr. Konzelman’s money and wallet — suggests, contrary to the dissent’s assertions, see dis. op. at 845-46, that the burglars’ planning would not have included a debate as to whether they should arm themselves or any discussion as to who would carry the weapon, and that a juror would not be likely to credit the pair with such an organized or detailed level of planning.
It is not disputed that the crowbar came from somewhere in the Konzelmans’ garage. The state has never argued that either Smith or Edmonds brought it with him and Mrs. Konzelman testified that the crowbar used in the attack was one that she and her husband used frequently and that they kept in the garage. The district court opinion acknowledges that “[b]oth the garage and the interior of the house were dark when [Smith and Edmonds] entered, so Smith might not have noticed if Edmonds was carrying a dark-colored crowbar. ... Indeed, Edmonds claimed he was unaware of the crowbar until he first saw it in Smith’s hands in the bedroom.” The district court’s subsequent observation that “[t]he converse might also have been true, if Edmonds is reversing the roles,” is supported by Edmonds’s recantations, which identify him and not Smith as the actual attacker. Under those circumstances, it would have been Smith who was unaware that Edmonds was armed.[19] Furthermore, as the district court noted, the two men were in different parts of the house for most of the time.[20] *820 The attacker apparently was not holding the crowbar in plain view when the second intruder passed by the room, as Mrs. Konzelman did not see anything in the attacker’s hands until he picked the crowbar up from the ground just prior to attacking her husband.[21] Smith was not present when Edmonds struck Konzelman, as evidenced by Mrs. Konzelman’s statements about a lone attacker. According to Mrs. Konzelman, the second burglar “came from the den, up through the hall, and stopped at the door long enough for me to see his bandanna and headed out,”[22] sometime before Edmonds picked up the crowbar and struck the victim. This version of events finds further support in Edmonds’s more recent affidavit asserting that Smith never entered the bedroom: “I know that Mr. Smith did not bludgeon or otherwise strike Mr. Konzleman [sic] and I know that Mr. Smith never entered the Konzleman’s [sic] bedroom where the killing occurred.” In sum, the evidence as to precisely what occurred in the garage and in the house is far from clear. As with the third element, however, having decided that it is more likely than not that Edmonds was the killer and thus the person who found, carried, and used the crowbar, and assuming the truthfulness of Edmonds’s recantations, we conclude, although this issue is close, that any reasonable juror would have determined that a preponderance of the evidence shows that Smith had no reasonable ground to believe that Edmonds had armed himself immediately prior to entering the house.
The last element of the affirmative defense requires Smith to show that it is more likely than not that he had no reasonable ground to believe that Edmonds intended to engage in conduct likely to result in death. As discussed supra, it is more likely than not that Smith was not aware that Edmonds had picked up a crowbar and was armed. The evidence supporting that conclusion would also support the conclusion that Smith had no reason to believe that Edmonds intended to do anything other than burglarize the house. Edmonds himself stated that prior to entering the house, there had never been any discussion between him and Smith about hitting anyone or using any kind of weapon on anyone. In a deposition, Smith stated with respect to the killing of Mr. Konzelman that “I didn’t know [Edmonds] was going to do it.”
The district court never found that Edmonds and Smith planned to engage in any violent conduct or even discussed doing so. Rather, it reasoned that because Edmonds and Smith were aware that the Konzelmans were home, they should each have been aware that the robbery might result in confrontation with the residents, and that they therefore each had reason to believe that they would engage in conduct *821 likely to result in death. We disagree that a generic residential robbery is likely to result in death — especially when there are no plans to engage in violent conduct and, to Smith’s knowledge, no weapons on hand with which to do so.[23]
If the district court were correct in concluding that any residential burglary is likely to result in death simply because one can foresee a remote possibility of death occurring such as the possibility that a “resident might awaken startled, and suffer a fatal heart attack” or that a “[f]atal accident[ might] occur when police or ambulance crews are racing to the scene” — then the affirmative defense would be inapplicable in every case of felony murder. The district court’s reasoning would effectively foreclose the affirmative defense to anyone who committed, or even attempted to commit, any of the ten offenses that qualify for felony murder. See Or. Rev. Stat. § 163.115(l)(b) (2003). Additionally, the term “likely” in Oregon’s affirmative defense to felony murder implies a stronger possibility than a merely remote one.[24] See, e.g., State v. Watkins, 146 Or.App. 338, 932 P.2d 107, 109 (1997) (in which a victim’s death was deemed “a significantly greater harm than is typical for the crime of robbery” and the defendant was acquitted of felony murder after raising the same affirmative defense); cf. State v. Dickerson, 112 Or.App. 51, 827 P.2d 1354, 1355 (1992) (in which the defendant was found to have reasonable grounds to believe another participant in the crime intended to engage in conduct likely to result in death based on conversations defendant had with other participants about “how to handle the situation” and the decision to kill the victim “to ensure her silence”). Indeed, if the commission or attempted commission of any of the listed felonies in section 163.115(l)(b) — which include arson, assault, and robbery — -automatically constituted conduct likely to result in death, one would assume that Oregon would not have made the affirmative defense available at all for such charges. Because it cannot be assumed that generic robbery is likely to result in death and the evidence in this case rebuts any claim that Smith had reasonable cause to believe that this particular robbery was likely to do so, Smith has more likely than not satisfied the fifth and final element of the affirmative defense.[25]
*822 In reaching the opposite conclusion, that it is not “more likely than not” that a reasonable juror would find that all five elements of the affirmative defense had been met, the dissent makes the mistake of approaching the Schlup analysis exactly as we stated it should not be applied in Carriger: “We do not agree ... that our test under Schlup is to decide how a hypothetical jury would regard each bit of new evidence.” Carriger, 132 F.3d at 474 n. 4. Instead, we held, under Schlup, “[o]ur task is to determine whether confidence in the actual verdict is undermined.” Id. The dissent misconstrues the Schlup test, which ultimately requires only that Smith demonstrate that it is more likely than not that any reasonable juror would find that he had satisfied the elements of the affirmative defense to felony murder by a preponderance of the evidence — or, in other words, that there is a 51% or greater chance that any reasonable juror would conclude that the affirmative defense had been met in this case. Because an analysis of all of the evidence now before the court — and particularly Edmonds’s recantations — would more likely than not lead any reasonable juror to believe that Smith was not guilty of the crime of felony murder, we hold not that Edmonds rather than Smith is the actual killer, but that Smith has successfully passed through Schlup’s “actual innocence” gateway and is entitled to a hearing on the merits of his constitutional claims.
B.
To the extent that our analysis relies on the truthfulness of Edmonds’s recantations, there remains the question of his credibility. Under other circumstances, we might remand for an evidentiary hearing to allow the district court to assess the trustworthiness of Edmonds’s more recent statements. See Jaramillo, 340 F.3d at 883 (holding that new evidence presented by petitioner would, if credible, be sufficient to support a finding of actual innocence and remanding for an evidentiary hearing for the court to make the necessary credibility determinations). The circumstances here, however, are not conducive to such a remand. In this case, due to the prosecution’s threats to pursue capital charges against him, Edmonds has refused to testify, even after being promised immunity from perjury (if he testifies as the prosecution wishes). The facts regarding the prosecution’s conduct have all been established in the record[26] and, as the *823 district court recognized, a further hearing would serve no purpose.[27] We must now consider, then, whether the prosecution engaged in misconduct that substantially interfered with Smith’s efforts to establish his Schlup claim and, if so, what the remedy should be.

1. Prosecutorial Misconduct

The prosecution effectively prevented Edmonds from testifying by threatening to institute capital murder charges against him — specifically, as the district court put it, to “seek the death penalty” — if he testified in a manner that was consistent with his two affidavits. The state also offered to immunize him from perjury if he would withdraw his recantations and testify that Smith was the killer. Due to the drastic nature and the unusual character of the prosecution’s threats and, specifically, due to the state’s declaration of its intentions to subject him to the death penalty, Edmonds understandably invoked his Fifth Amendment privilege and refused to testify about any and all facts relating to the murder of Konzelman, even — as the district court notes — after he received the state’s offer of immunity if he testified against Smith. The prejudicial effect of the state’s actions is starkly demonstrated by the district court’s finding that “[a] logical inference” from Edmonds’s refusal to testify in the manner the state desired, even after the prosecution’s promise of immunity if he would do so, is that “if Edmonds did testify truthfully, he would say that Smith did not kill Emmitt [sic] Konzelman, and implicate himself as the killer.”
Threatening a potential witness for the defense with execution constitutes prosecutorial misconduct far more coercive than that present in any reported case of which we are aware. The cases in which courts have considered the prosecution’s threats to charge witnesses with perjury or other criminal offenses, have all involved the possibility of far less serious punishment. See, e.g., United States v. Vavages, 151 F.3d 1185, 1188, 1192 (9th Cir.1998); United States v. Lord, 711 F.2d 887, 889, 892 (9th Cir.1983); see also United States v. Morrison, 535 F.2d 223, 225, 228-29 (3d Cir.1976). Here, the prosecution’s unprecedented threat to seek the death penalty against Edmonds if he testified that Smith was not the killer was unquestionably coercive and constituted substantial interference with Edmonds’s decision whether to testify. Cf. Earp v. Omoski, 431 F.3d 1158, 1170 (9th Cir.2005) (“It is well established that ‘substantial government interference with a defense’s witness’s free and unhampered choice to testify amounts to a violation of due process.’ ”) (citing Vavages, 151 F.3d at 1188).[28]
*824 The dissent repeatedly insists that we should remand for an evidentiary hearing on the question whether the prosecutor’s misconduct was intentional. See, e.g., dis. op. at 840. There is no cause for such a hearing in this case. The “intent” to which the dissent refers is the intent to cause a witness not to testify in a particular manner or not to testify at all. See Lord, 711 F.2d at 891. The prosecution here intimidated Edmonds into refusing to testify by making a threat of the gravest nature, a threat that was clearly improper, especially given the prosecution’s prior determination in Smith’s case that an appropriate punishment for the actual killer was 30 years to life. In cases in which the harassment, intimidation, or coercion of a witness is evident, intent is not at issue; rather, the issue under our prior cases has been whether the interference was “substantial” and whether it affected the witness’s decision to testify.[29] Cf. Williams v. Woodford, 384 F.3d 567, 601-02 (9th Cir. 2004) (“Undue prosecutorial interference in a defense witness’s decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying, for example, by threatening the witness with prosecution for perjury or other offenses.... The prosecution’s conduct must amount to a substantial interference with the defense witness’s free and unhampered determination to testify before the conduct violates the defendant’s right to due process.”); Vavages, 151 F.3d at 1189 (“A defendant’s constitutional rights are implicated only when the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witnesses] decision whether to testify.”).[30] *825 In sum, our cases have ordered a remand only where necessary to make a showing of intent, see Lord, 711 F.2d at 890; given the prosecutorial conduct involved, no such showing is required here.
It is evident that the prosecution’s threat to seek the death penalty against Edmonds was intended to coerce Edmonds into changing his testimony or refusing to testify. “Where, under the totality of the circumstances, ‘the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong.” Vavages, 151 F.3d at 1190 (quoting United States v. Pierce, 62 F.3d 818, 832 (6th Cir.1995)) (internal quotation marks omitted).[31] The prosecution warned Edmonds that if he testified in a particular manner — one that would be consistent with Smith’s defense — it would attempt to have him executed. In contrast, it informed him that if he withdrew his recantations and testified in accordance with its case against Smith, it would provide him with immunity from perjury. Interestingly, the state did not seek to prosecute Edmonds on the basis of his submission of the affidavits exculpating Smith and inculpating himself; it was only his testimony on behalf of Smith that, the state declared, would provoke it to seek to execute him. There can be no dispute that by constructing the options as it did, the prosecution clearly intended to compel Edmonds either to testify in the manner that would favor its case against Smith or not testify at all. Facing the possibility of a death sentence, Edmonds did not have a realistic option to testify in accordance with his previous recantations, even if — as the district court inferred — those recantations were likely truthful. Because it is clear that the prosecution’s threats intimidated Edmonds into *826 invoking his Fifth Amendment privilege, even after he was offered immunity, we conclude that no further hearing regarding intent is required and that the prosecution’s interference constituted serious misconduct that denied Smith a fair hearing on his Schlup claim. We therefore proceed to a discussion of the appropriate remedy.

2. Remedy

In determining what the remedy should be, we observe that in all of the prior cases we have uncovered, the prosecutorial misconduct affected the outcome of a trial to determine the defendant’s guilt or innocence. The remedy we imposed in those cases was to reverse or vacate the defendant’s conviction. Here, by contrast, the underlying question is only whether the federal courts should be permitted to hear a petitioner’s constitutional claims on the merits. Because of that difference, we approach the remedy differently. We may look to our precedents regarding prosecutorial interference with an actual trial for guidance, but those cases do not control this appeal. The novel procedural posture of the case before us permits us to remedy the prosecutorial misconduct by far less drastic means.
As an initial matter, we cannot accept the dissent’s suggestion to remand to the district court for an evidentiary hearing on actual innocence under Schlup. Dis. op. at 840-43. Such a remedy would be both futile and ineffective, even were we to require the state to grant Edmonds “use immunity” for his testimony at that hearing.[32] The district court found that holding a Schlup hearing would be a “pointless exercise” so long as Edmonds refused to testify. See supra note 27. Although use immunity sometimes serves to encourage defense witnesses to testify after they have been deterred from testifying previously, the present case is not the usual one. Death is indeed different, and threatening to seek a witness’s execution if he testifies in a manner that would exculpate the defendant is fundamentally different from threatening to charge a witness with perjury or with some other less serious non-capital offense.
In this case, use immunity would not effectively counter the threat of execution, as the state would be free to seek the death penalty even if barred from relying on Edmonds’s testimony.[33] If Edmonds did decide to testify, there would be no way to ensure that the looming prosecutorial threat of execution would not significantly influence his testimony. Without assurances that he would not be facing capital charges as a result of his testimony — assurances that use immunity would not provide — Edmonds could not, in light *827 of the prosecutor’s threats, be expected to risk the imposition of a death sentence by providing testimony exculpating Smith and inculpating himself, regardless of its truthfulness. Any testimony that contradicted his affidavits would be of doubtful reliability-
We are faced with three alternatives, then, for remedying prosecutorial misconduct in a case such as Smith’s, in which the misconduct occurs at the Schlup stage and the petitioner has presented affidavits from the witness regarding the facts to which he would have testified had the state not caused him to refuse to do so. First, we could issue the writ. Second, we could prohibit the state from asserting the procedural bar that blocks the petitioner from presenting the merits of his claims. Third, we could afford the affidavits a presumption of truthfulness and consider the Schlup inquiry on that basis. On balance, we conclude that the third alternative— presuming Edmonds’s recantations to be true for the limited purpose of determining whether Smith may pass through the Schlup gateway — is the least intrusive on the state’s interests and most consistent with the procedural posture of the case.
In this regard, we emphasize that we are not here considering how a state must conduct a trial in its courts or how the state courts must remedy instances of prosecutorial misconduct; instead, we are determining whether a federal proceeding has fairly afforded a petitioner his federal rights and what remedy will best allow a federal court to fulfill its proper role. We do so mindful that our remedy should be narrowly tailored and as respectful of the state’s interests as possible.
The first alternative — issuing the writ of habeas corpus — would have the effect of requiring the state to retry Smith. This is the usual remedy when the prosecutor’s misconduct interferes with the defendant’s ability to present his defense at trial. In most instances of prosecutorial misconduct causing defense witnesses to withhold testimony, this court has reversed or vacated the defendant’s conviction. See, e.g., Vavages, 151 F.3d at 1193; Young, 86 F.3d at 946; Westerdahl, 945 F.2d at 1088; Lord, 711 F.2d at 891-92. In the context of a hearing to determine whether a prisoner should be precluded from presenting his constitutional claims because of his failure to comply with procedural prerequisites, however, it is not necessary to reverse the conviction or issue the writ; less consequential and more appropriate remedies are available.
The second alternative — prohibiting the state from asserting the procedural bar— is far less intrusive on the state’s interests. It would simply allow the federal proceedings to continue. This remedy is better tailored than reversal to the procedural posture of the case. It is, nevertheless, overbroad. Such a remedy could turn prosecutorial misconduct into a windfall by granting relief to petitioners who have suffered no prejudice as a result of the prosecutor’s misconduct. The remedy would allow any petitioner who was unable to present a witness because of prosecutorial misconduct to overcome his procedural default, even if the witness’s statements, along with the rest of the evidence, would not be sufficient to meet Schlup’s strict standard.
We conclude that the third alternative— the more measured remedy of deeming Edmonds’s affidavits credible for purposes of the Schlup determination — is clearly preferable. Such a remedy provides relief only to a petitioner who has been deprived of the opportunity to present testimony that, if believed, would enable him to make the showing Schlup requires. Such a resolution emphatically does not provide the witness with immunity for a murder *828 he may have committed. Although our remedy may be different than those we have applied in the past, it is because the procedural posture of this ease is different. Thus, the remedy is not “extraordinary,” dis. op. at 843. Indeed, given that neither we nor the district court has yet considered the merits of the alleged constitutional violations, it would be far more extraordinary were we to reverse Smith’s conviction and remand for retrial, see, e.g., Vavages, 151 F.3d at 1193, or reverse his conviction and order acquittal if the state does not request use immunity, see, e.g., Westerdahl, 945 F.2d at 1088.[34] Here, we stop far short of that drastic relief, holding merely that Edmonds’s affidavits must be presumed to be true for purposes of the Schlup inquiry. Even considering the consequences of the remedy we apply— when Edmonds’s affidavits are presumed to be true, Smith is able to pass through the Schlup gateway and present the merits of his constitutional claims — our relief is far less drastic than that afforded the defendants in our earlier cases. In the end, Smith’s case will rise or fall on the validity of his constitutional challenges. Only if he succeeds on the merits will a writ issue and his case be returned to the state courts for a new trial.[35]
Because the prosecution’s threat of a death sentence was so coercive as to prevent Edmonds from testifying, and because the state’s conduct has, at the very least, severely tainted any testimony not exculpatory of Smith that Edmonds might offer at a Schlup hearing, Edmonds’s affidavits must be presumed to be credible, for purposes of resolving the question whether Smith’s procedural default should bar him from presenting his habeas claims on the merits. On the basis of that presumption, as well as the other available evidence, Smith has made the requisite showing of actual innocence necessary to proceed to a hearing on his constitutional claims.
V.
We hold that Smith’s constitutional claims are not proeedurally barred insofar as they relate to his felony murder conviction. We reverse and remand to the district court for a determination of those claims on the merits. Additionally, because it never decided whether there should be an evidentiary hearing to develop the factual basis of Smith’s constitutional claims,[36] we leave it to the district court to decide in the first instance whether such a hearing should now be conducted.[37]
*829 REVERSED and REMANDED for further proceedings consistent with this opinion.

. On the basis of the oral argument and briefs submitted to this court, we construe Smith's appeal as challenging the procedural default of his claims only with respect to his felony murder conviction and not with respect to his robbery conviction. Therefore, a Schlup showing of "actual innocence” as to the felony murder charge will suffice to overcome the challenged procedural default with respect to that conviction and will allow Smith to proceed on the merits of the claims relevant to that charge only. Smith offers no facts or arguments that would support a claim of actual innocence of the robbery offense or would otherwise excuse his procedural default as to that conviction. Thus, the robbery conviction stands.

. The evidence suggesting Edmonds was the person responsible for the killing will be explored in more detail in the "actual inno *808 cence” section of the opinion. See infra Part IV.A.

. Although the record regarding Edmonds’s actual sentence is not clear, it appears from his subsequent criminal record that his actual sentence may have been substantially less than the purported recommendation.

. The district court held that because it found all of Smith's claims to be procedurally defaulted, it did not need to address any of them on the merits. In doing so, the district court failed to address the freestanding claim of innocence asserted in Smith’s amended federal habeas petition, even though it noted that innocence claims are not cognizable in Oregon courts. Cf. Herrera v. Collins, 506 U.S. 390, 393, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (in which petitioner asserted a freestanding claim of actual innocence based on newly discovered evidence and contended that his execution would therefore violate the Fourteenth and Eighth Amendments). In his amended federal habeas petition, Smith, like Flerrera, argued that he is actually innocent of felony murder and that his conviction therefore violates the Fourteenth Amendment's guarantee of due process and the Eighth Amendment's prohibition against cruel and unusual punishment. Smith appears, however, to have intended to assert both a freestanding claim and the type of claim that serves to excuse procedural default (a Schlup claim). See id. at 404-05, 113 S.Ct. 853 (distinguishing between the "colorable showing of actual innocence” that is used to "seek excusal of a procedural error ... [of] an independent constitutional claim” and a "freestanding claim[] of actual innocence”).
We need not decide now whether, as the magistrate judge concluded in his Findings & Recommendations report, any freestanding (or "Herrera ”) claim is cognizable only in capital cases, see id. at 417, 113 S.Ct. 853 (assuming, for the sake of argument, that "in a capital case a truly persuasive demonstration of 'actual innocence’ made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim”); for the district court did not adopt that ruling, but instead held, erroneously, that Smith's freestanding claim of actual innocence was procedurally barred. A freestanding "actual innocence” claim, however, may not be procedurally defaulted. Rather, this type of claim constitutes an exception to the procedural default provisions. Moreover, in this case, there was, as noted earlier, no way for Smith to bring the claim in state court. The district court should have addressed the freestanding claim directly. Given the "extraordinarily high” standard established in Herrera, however, see id., Smith's prospects for prevailing on that claim would appear to be minuscule at best.

. For the same reason, we need not reach the question whether Smith was denied a fair opportunity to present his federal constitutional claims during the state post-conviction process.

. In Smith’s case, he is no longer able to obtain state review of his claims, given Oregon’s procedural bar regarding time limits for filing petitions for post-conviction relief. See Or. Rev. Stat. § 138.510 (2003).

. Bousley v. United States, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), also requires Smith to prove his Schlup claim with regard to the aggravated murder charge foregone by the state as a result of the plea agreement. See id. at 624, 118 S.Ct. 1604. Here, a determination that we cannot have confidence in his felony murder conviction would necessarily imply the same finding of "actual innocence” with regard to the more serious crimes foregone by the state.

. The fact that, just three years after the date of his plea agreement, Edmonds committed a residential burglary, kidnapping, and rape, also tends to support the conclusion that Edmonds, not Smith, was the killer in the instant case. Of course, if Edmonds were on trial, the introduction of this "bad act" evidence to prove his guilt would be unfair to him and would almost certainly violate the Federal Rules of Evidence. This habeas proceeding, however, concerns Smith, not Edmonds, and ignoring this evidence would prejudice Smith in his effort to prove his innocence. On habeas review under AEDPA, we may consider such evidence, which was “unavailable at [Smith’s] trial,” without regard to "the rules of admissibility that would govern at a trial.” Schlup, 513 U.S. at 327-28, 115 S.Ct. 851 (expressly permitting consideration of evidence that was "excluded” or "alleged to have been illegally admitted”).
The dissent cites Old Chief v. United States, 519 U.S. 172, 180-82, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), to warn against the dangers of propensity evidence. Dis. op. at 838 n.17. Old Chief, however, describes "bad act” evidence as "relevant,” "logically ... persuasive,” and "probative.” 519 U.S. at 180-81, 117 S.Ct. 644 (quoting United States v. Moccia, 681 F.2d 61, 63 (1st Cir.1982) (Breyer, J.); Michelson v. United States, 335 U.S. 469, 475-76, 69 S.Ct. 213, 93 L.Ed. 168 (1948)). It then explains that this relevant, probative evidence is nonetheless excluded at trial when offered against a criminal defendant because it is highly prejudicial and its admission would create a risk that the defendant could be convicted on less than evidence beyond a reasonable doubt. Id. at 180-82, 117 S.Ct. 644. Because there is no such risk to any person in this case, consideration of Edmonds’s bad acts is not only permitted under Schlup, but also makes sense under the rationale of Old Chief.

. The dissent argues that Edmonds's affidavits are "internally inconsistent and plainly inconsistent with each other.” Dis. op. at 842. The language cited by the dissent is taken out of context. Edmonds stated in his first recantation — after stating explicitly that he had committed perjury, that Smith did not kill Konzelman, and that he was attempting to "set the record straight” — that "[t]he reason[he] lied under oath was because [his] attorney ... led [him] to believe that Roger Smith was about to testify and leave [him] to do a life sentence for a crime he did not commit.” Given the unequivocal nature of every other statement relating to guilt in the affidavit, this confusing statement could have resulted either from Edmonds’s characterization of his defense attorney's advice or the fact that he swore out his first affidavit without the benefit of an attorney's supervision to help him clarify his statements. In contrast *815 to his first recantation, Edmonds’s second recantation does not contain any such confusing language and even includes a statement that is likely a more accurate characterization of the allegedly inconsistent statement in his first recantation: 'T was motivated to falsely implicate Mr. Smith because my trial attorney and others counseled that, by doing so, I could avoid prosecution for murder or aggravated murder."

. Even though polygraph evidence may not be admissible at trial under Oregon law, we may consider this evidence under Schlup. Schlup, 513 U.S. at 328, 115 S.Ct. 851.

. Further, the details about the actual murder that Edmonds was able to provide could best be explained by the fact that he was the attacker and therefore would have known the details of what occurred in the bedroom. A conclusion that the second, non-attacking burglar could provide such corroborated details of the murder would conflict with Mrs. Konzelman's statement that she could only catch a “brief glimpse” of the second burglar "as he went down the hall.” Thus, it is doubtful that Edmonds would have known the details of the attacker’s interaction with the Konzelmans in the bedroom unless he had been there for the duration, and not just passing by — in other words, unless he was the actual attacker.

.The dissent contends that Edmonds’s statements to his cellmate Samuel Seaman were consistent with the statements that Edmonds gave to police and therefore support the argument that Smith was the killer. Dis. op. at 833. It should be noted, however, that Sea *816 man was also skeptical of Edmonds's story and told officers that "the way [Edmonds] talk[ed] about it [was as if] he [was] trying to cover up for himself.”

. Edmonds testified at Smith’s sentencing hearing that when they got to the Konzelmans’, it was he, and not Smith, who had been wearing a Levi's jacket with a white lining.

. Mrs. Konzelman also stated in her interview with police that she believed the pants were more like dress pants, not jeans.

. Like the dissent, we understand that Mrs. Konzelman was confused during parts of her testimony. Nevertheless, certain parts of her testimony are clear and unequivocally point to Edmonds, not Smith, as the attacker.

. The dissent criticizes us for crediting Edmonds’s statements only when it is convenient. See dis. op. at 841-42. To the extent that Edmonds has recanted his earlier testimony that Smith was the actual attacker, it is true that we have deemed the earlier testimony not credible and his later testimony truthful. Such a conclusion does not preclude us from evaluating other testimony given by Edmonds — such as what the two of them were wearing on the night of the murder, or where they were with respect to one another once inside the house — and the extent to which a jury would be likely to find such testimony credible, in light of the other available evidence. Further, because Edmonds’s various descriptions of the incident — as provided by his testimony and prior to his recantations— are not always consistent, any factfinder would be forced to choose the elements of his story that it found credible and those that it did not; the dissent’s suggestion that we must either afford full credibility to his testimony or none at all creates an unreasonable and unrealistic choice.

.Because a rope was found just to the "left of the bedroom door,” Smith likely dropped the rope when he paused briefly in the bedroom doorway and before he continued down the hall. Therefore, the fact that Smith was carrying the rope does not mean that he entered the Konzelmans’ bedroom and can be *818 reconciled with both Mrs. Konzelman’s recollection that only the attacker was in the bedroom and Edmonds's second recantation, in which he stated that Smith never entered the bedroom.

. Still, the dissent cites State v. Cornell, 314 Or. 673, 842 P.2d 394 (1992) (in banc), as support for its conclusion that the rope Smith carried was a dangerous weapon. In Cornell, the Oregon Supreme Court upheld the felony murder conviction of a defendant who stuffed toilet paper into his victim's mouth and "hogtied” him around the neck with a cord, which asphyxiated him. Id. at 396. The opinion says not a word about whether a cord or rope is a dangerous weapon — it had no need to, because the use of a dangerous weapon is not an element of felony murder in Oregon, only an element of the affirmative defense. See Or. Rev. Stat. § 163.115. The defendant in Cornell, however, had not raised the affirmative defense, and thus the court had no need to consider the question in that case.

. Bouse testified that when the three first entered, Smith went into the house while Edmonds searched the garage, and Edmonds testified that during the time that he and Smith were both exploring the garage, they were searching in separate parts of it. Therefore it is likely that Edmonds found the crowbar without Smith’s knowledge.

. Like much of the testimony provided, Edmonds's testimony as to how and when the two men entered the house is unclear. The accounts the dissent refers to in which Edmonds suggested that he and Smith entered together are far from precise. See dis. op. at 848 n. 44. Such accounts are unclear as to whether the two entered at the same time, so *820 that each could observe what the other may have been holding, and do not suggest that they kept track of one another’s whereabouts while in the house.

. According to Edmonds's initial testimony, he first saw the crowbar in Smith’s hands when both he and Smith entered the Konzelmans’ bedroom together. As noted supra, Edmonds's version of the story, insofar as it places Smith as the killer, is discredited by his subsequent recantations. Further, although it is possible that Edmonds may have reversed his and Smith’s roles in providing his original version of events, the fact that Mrs. Konzelman' — a neutral witness — "recalled the killer picking the crowbar off the floor before striking the blows” and that "he had not been carrying the crowbar around in his hand” suggests not only that Edmonds was the one handling the weapon, but also that Smith was never aware that Edmonds was armed, either before or after seeing Edmonds in the Konzelmans’ bedroom when he paused by the doorway.

. Edmonds told a Linn County detective that both he and Smith wore bandannas as masks.

.See Enmund v. Florida, 458 U.S. 782, 799-800, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (noting that "only about one-half of one percent of robberies result[] in homicide” and that "killings only rarely occur during robberies”). Although Enmund's data are somewhat outdated, more recent data support our conclusion as well. Using the same data source that the Supreme Court used in Enmund (with updated data), and the same methodology, see Enmund, 458 U.S. at 800 n. 24, 102 S.Ct. 3368, data from 2005 show that less than one quarter of one percent (0.22%) of all robberies result in homicides. See U.S. Dep’t of Justice, Federal Bureau of Investigation, Crime in the United States 2005.
The dissent opines that these statistics are not "sufficiently refined,” and that the proper measure of risk is the probability that a burglary that “might turn confrontational” will result in death. Dis. op. at 851 n. 52. By definition, however, every robbery included in the FBI report — the set of crimes to which the 0.22% figure applies — involves the use or threat of force or violence or putting the victim in fear. See Crime in the United States 2005. Burglaries, which are by definition less confrontational, are not included in the Report’s statistics unless they turn into robberies, such as in the crime involved in this case.

. The district court conceded that "[t]he word likely does give some pause,” but failed to require a stronger nexus than a theoretical possibility.

. In concluding otherwise, the dissent again cites State v. Cornell, 314 Or. 673, 842 P.2d 394, in which the Oregon Supreme Court upheld the felony murder conviction of a defendant who used a cord to "hog-tie” and *822 asphyxiate his victim. The dissent asserts that "a reasonable juror would very likely conclude that Smith brought the rope into the house with the contemplated purpose of using it to restrain the victims” and argues that Cornell supports the conclusion that "[tjying victims up is highly dangerous conduct that is likely to result in death.” Dis. op. at 851 (emphasis added). Therefore, the argument goes, Smith must have known that death was likely to result from his and Edmonds's robbery. The dissent's argument fails on two levels. First, even if a reasonable juror did conclude that Smith "contemplated” using the rope to restrain the Konzelmans, this is a far cry from concluding that it was likely that he would restrain them. Second, and more important, even if it was likely that Smith would restrain the Konzelmans, this hardly means that it was likely that one of them would die. Contrary to the dissent's assertion, tying the hands, feet, or even body of another person is not likely to result in death. The fact that the defendant in Cornell tied his victim around the neck after stuffing toilet paper into his mouth, and that this extraordinary action caused death, does not even come close to supporting the conclusion that Smith had reason to believe that death was likely to ensue if he used the rope to restrain the Konzelmans.

. The district court made the following findings: "The Linn County prosecutor's office ... warned Edmond’s [sic] counsel that the district attorney would seek the death penalty if Edmonds testified that he, and not Smith, actually killed Emmett Konzelman. On the *823 other hand, if Edmonds withdrew that affidavit and testified that Smith was the killer, the State agreed to give Edmonds immunity from charges of (allegedly) filing a false affidavit. After conferring with his counsel, Edmonds refused to testify on the ground that the answers might incriminate him.”

. The district court found that to hold an evidentiary hearing “would be a pointless exercise so long as Edmonds refuses to testify.” Given that Edmonds's testimony would be relevant only to Smith's claims of innocence, it is most likely that the evidentiary hearing to which the district court referred was an evidentiary hearing regarding actual innocence under Schlup. A more limited hearing to determine only the credibility of Edmonds's exculpatory statements would be equally pointless. Edmonds would have all the same reasons not to testify regardless of the scope of the hearing, and without his testimony either future hearing would be of no avail.

. We reject the dissent's argument that the prosecution’s suggestion that the court provide Edmonds with counsel demonstrates that it was not seeking to silence him but to lay a foundation for prosecuting him. Dis. op. at 836-37. Certainly the prosecution was aware *824 that appointed defense counsel would greatly aid its efforts to achieve its goal' — appointed counsel almost certainly would advise Edmonds that he would run a substantial risk of receiving a capital sentence if he testified, consistent with his affidavits, that Smith was not the killer. Counsel might even advise Edmonds that, as the dissent now argues, counsel’s appointment was a necessary preliminary step to Edmonds’s execution.

. In cases of threat or coercion, no separate and additional showing of intent has been required. The prosecution's affirmative acts — in this case, the prosecution's threat to seek the death penally against Edmonds — • inherently demonstrate the requisite intent. See, e.g., Earp, 431 F.3d at 1168-71 (remanding not to determine prosecutorial intent, but only to evaluate the credibility of affidavits alleging that the prosecutor had threatened a potential defense witness); Vavages, 151 F.3d at 1187, 1190-93 (reversing a conviction without an evidentiary hearing where the prosecutor threatened a potential defense witness with perjury charges and the withdrawal of a plea agreement in an unrelated prosecution); Morrison, 535 F.2d at 225-29 (reversing a conviction without an evidentiary hearing where the prosecutor made repeated threats and warnings to a potential defense witness, culminating in a "highly intimidating personal interview”). Cases in which the prosecution merely denies immunity to potential defense witnesses, by contrast, typically do require remand for evidentiary hearings to determine prosecutorial intent. See, e.g., United States v. Young, 86 F.3d 944, 946-49 (9th Cir.1996) (remanding for an evidentiary hearing on intent where the prosecution granted immunity or favorable plea agreements to prosecution witnesses but withheld immunity from a potential defense witness); United States v. Westerdahl, 945 F.2d 1083, 1087 (9th Cir.1991) (same); Virgin Islands v. Smith, 615 F.2d 964, 969 (3d Cir.1980) (remanding where the prosecution withheld immunity from an important potential defense witness). Cases in which the record of prosecutorial conduct is unclear may also require remand for clarification. See, e.g., Lord, 711 F.2d at 891-92 (remanding for "further clarification of the prosecutor's pre-trial comments” to a potential defense witness). There is no need for a remand here, however, as the prosecution indisputably took affirmative steps to cause Edmonds not to testify in the manner set forth in his affidavits.

. The dissent argues that we cannot look to United States v. Vavages because Smith cited instead our decision in United States v. Westerdahl, and the two cases represent doctrines *825 that are entirely distinct. Hence, the dissent's argument goes, Smith has waived his "Vavages argument.” We disagree. Although the two cases admittedly put forth slightly different doctrinal tests, they address precisely the same doctrinal issue: prosecutorial misconduct that materially affects a defendant's opportunity to present his case. Furthermore, the cases descend from the exact same doctrinal ancestor: Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). Indeed, the dissent itself points out that Vavages stems directly from Webb, dis. op. at 836; Vavages also leans heavily on United States v. Morrison, a decision that found Webb " controlling],” 535 F.2d at 227. Westerdahl is simply a bit more removed, relying primarily on United States v. Lord, which in turn relied on Morrison (which found Webb controlling). Once it is clear, as here, that a defendant alleges prosecutorial misconduct that interferes with the presentation of his witnesses, we would be remiss to ignore certain prior decisions of this court (e.g., Vavages) while focusing exclusively on others (e.g., Westerdahl). Certainly, it would not be consistent with fundamental concepts of justice to deprive an individual of a hearing on his constitutional claims because he cited one rather than the other of two related cases addressing the same basic issue.

. In Vavages, a potential witness invoked her Fifth Amendment right against self-incrimination based on the prosecution’s threats to charge her with perjury and withdraw a plea agreement in an unrelated prosecution if she testified for the defense. 151 F.3d at 1187— 88. There, we held that "[i]t [did] not require much of an interpretive gloss on the prosecutor’s warning to conclude that unless [the defense witness] changed her testimony or refused to testify at all, she would be prosecuted for perjury and suffer any attendant consequences” and that "there [was] no question that the prosecutor’s warnings were a 'but for’ cause of [the witness’s] refusal to testify,” thus constituting substantial interference. Id. at 1190-91. The Vavages court held that the district court had "clearly erred in finding that Vavages[ ] had not been prejudiced by the prosecutor's substantial interference with [the witness’s] decision whether to testify and [therefore] reverse[d] Vavages’[s] conviction and remand[ed] for retrial.” Id. at 1193.

. Use immunity provides that, "while the government may prosecute the witness for an offense related to the subject matter of the witness's testimony, the testimony itself and any 'fruits' thereof may not be used against the witness in any criminal case except a prosecution for perjury arising out of the testimony.” Lord, 711 F.2d at 890.

. If Smith's conviction were reversed, the state could subpoena him and compel him to testify, truthfully, that Edmonds and not he was the killer. Edmonds certainly has reason to be concerned that Smith, once freed from prison, might not be willing to accept the consequences of refusing to testify. It is also possible that the state could rely on the declarations against interest contained in Edmonds's affidavits as well as any statements that a jailhouse informant might make. To be sure, it is not — as the dissent asserts- — -Edmonds’s "eligibility] for renewed charges” that has prevented him from testifying, dis. op. at 837, but rather the state's warning that it -would seek the death penalty if he testified. Use immunity would provide no guarantee that the state would not succeed in carrying out its threat.

. In Westerdahl, we reversed the defendant’s conviction and remanded to the district court. Because, unlike this case, it was unclear in Westerdahl whether the prosecutor had acted with the intent to distort the factfinding process, we instructed the district court to make that determination first. We then directed the district court to acquit Westerdahl if it found intent, unless the government requested use immunity for his witness. See Westerdahl, 945 F.2d at 1088.

. The dissent asserts that by adopting the third of the three remedial alternatives we consider, we have merely chosen a “bulldozer” instead of a “wrecking ball”; in other words, the dissent thinks that all of our considered alternatives are intrusive. Dis. op. at 841 n. 22. Surely, however, permitting a petitioner to present his constitutional claims in federal court bulldozes far less of the state’s efforts than reversing his conviction and forcing the state to try its case a second time. The Westerdahl remedy, which the dissent appears to prefer, entails the far more drastic latter consequences. See Westerdahl, 945 F.2d at 1088.

. The district court did not consider that question because it deemed Smith's claims proeedurally barred and denied him an evidentiary hearing on that basis.

. As we mentioned earlier, the district court must rule on the Herrera claim, although, as we also noted, that claim appears to have *829 only a minimal chance of success. See supra note 4.