# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3572

_____

| | |
|---|---|
| M.M., by and through her parent and natural guardian, L.R., | * |
| | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * Appeal from the United States |
| Special School District No. 1, et al., | * District Court for the |
| | * District of Minnesota. |
| Defendants - Appellants. | * |
| | * |
| ------------------------------------------------ | * |
| Minnesota School Boards Association, | * |
| | * |
| Amicus on Behalf of Appellants. | * |

_____

Submitted: April 2, 2007
Filed: January 4, 2008

_____

Before LOKEN, Chief Judge, BEAM and RILEY, Circuit Judges.

_____

LOKEN, Chief Judge.

M.M. is a child with educational disabilities who attends Minneapolis public schools in Minnesota's Special School District No. 1 (the District). The Individuals with Disabilities Education Act (IDEA) provides that M.M. is entitled to a free appropriate public education (FAPE) that includes special education and related services tailored to her unique needs. See 20 U.S.C. §§ 1400(d)(1)(A), 1401(14). In

May 2005, dissatisfied with the results of a mediation agreement, M.M.'s parent, L.R., requested a due process hearing under IDEA and state law. See 20 U.S.C. § 1415(f); Minn. Stat. § 125A.091, subd. 12-14. L.R. alleged that the District had imposed suspensions, exclusions, and administrative transfers that denied M.M. her right to a FAPE during the 2003-2004 and 2004-2005 school years.

After a hearing, the state Administrative Law Judge (ALJ) determined that the District violated the IDEA in both school years and awarded 188 hours of compensatory educational services. M.M. then filed this action seeking an award of costs and attorney's fees. See 20 U.S.C. § 1415(i)(3)(B). The District filed a counterclaim, challenging the ALJ's decision. The district court reduced the compensatory services award by eight hours and awarded M.M. substantial costs and attorney's fees. M.M. v. Special Sch. Dist. No. 1, No. 05-2270, 2006 WL 2571229 (D. Minn. Sept. 5, 2006). The District appeals. Reviewing the district court's ultimate determination that M.M. did not receive a FAPE *de novo*, we reverse. See CJN v. Minneapolis Pub. Sch., 323 F.3d 630, 637 (8th Cir.), cert. denied, 540 U.S. 984 (2003) (standard of review).

## I. The Burden of Proof Issue

Consistent with Minnesota law, the ALJ ruled that the District must prove, "by a preponderance of the evidence, that it is complying with the law and offered or provided a [FAPE] to the child in the least restrictive environment." Minn. Stat. § 125A.091, subd. 16. Following the hearing, the Supreme Court held that, if state law is *silent*, the burden of persuasion in an IDEA proceeding lies with the party seeking relief, here, M.M. Schaffer v. Weast, 546 U.S. 49 (2005). The Court declined to decide whether this rule would apply in States such as Minnesota that explicitly assign the burden elsewhere. Id. at 61-62. However, we subsequently held that it was error to assign the burden of persuasion to a Minnesota school district in an action

-2-

to enforce the procedural and substantive requirements of the IDEA. School Bd. of I.S.D. No. 11 v. Renollett, 440 F.3d 1007, 1010 n.3 (8th Cir. 2006).

Though Schaffer and Renollett were decided after the due process hearing, they apply to this pending case. See Harper v. Va. Dept. of Taxation, 509 U.S. 86, 97 (1993). The district court noted but declined to follow our decision in Renollett, concluding "that a close reading of Schaffer . . . does not support the IDEA's preemption of Minnesota law on this point." M.M., 2006 WL 2571229 at *15. This was fundamental error. Our decision in Renollett is controlling until overruled by our court en banc, by the Supreme Court, or by Congress. Though the district court described our discussion of the issue as "cursory," our opinion in Renollett cited the page in Schaffer that left the question open, and we then decided the question for the courts of this circuit.

"Placing the burden of proof on the incorrect party is reversible error" unless the error relates to an "immaterial issue." West Platte R-II Sch. Dist. v. Wilson, 439 F.3d 782, 785 (8th Cir. 2006) (citations omitted). We further conclude that the ALJ's award of compensatory educational services and the district court's award of attorneys' fees under the IDEA must be reversed on the merits.

## II. The 2003-2004 School Year

Emotional and behavioral issues were noted as a secondary disability when M.M. began receiving special educational services in the third grade. Serious behavioral issues emerged in April 2003, during her sixth grade year, when she brought a four and one-half inch serrated steak knife to Franklin Middle School. M.M. explained that she brought it to school in response to threats by two female classmates. An assistant principal recommended that M.M. be expelled. Instead, the District provided her homebound instruction for the remainder of that school year and transferred her to the Lucy Laney Community School (Laney) that Fall.

When M.M. began the 2003-04 school year at Laney, the District at L.R.'s request re-evaluated M.M.'s educational needs and performance and concluded that she continued to be eligible for special educational services. The evaluation identified "Emotional, Social, and Behavior" as now being M.M.'s primary disability, SNAP her secondary disability,[1] and Speech Language an additional disability. The November 2003 individualized education program (IEP)[2] set emotional and behavioral goals addressing M.M.'s frequent talking in class; kicking and hitting other students at least eight times a day; sleeping and refusing to work three to five days a week; and completing just 30% of her assignments. The IEP set educational goals in math, reading, and speech articulation, and the IEP team developed a Behavior Intervention Plan designed to decrease M.M.'s inappropriate behavior and increase her work completion through closer supervision and "tangible reinforcers."

In February 2004, M.M. was suspended when she got into a fight with another student and kicked and punched a staff member who intervened. The IEP team determined "that the setting here at Lucy Laney is not appropriate," extended the suspension to ten days, and reported that M.M. "will be transferred to another school." The report stated that L.R. "left the meeting early (upset)," but she did not request a due process hearing. M.M. was administratively transferred to Olson Middle School (Olson) on March 15, 2004, where she completed the 2003-2004 school year. A June 1, 2004, assessment reported that M.M. made adequate progress on her reading and math goals but insufficient progress on her behavioral goals. A social worker at Olson testified that M.M. made behavioral progress in the spring of 2004.

---

[1]"Student Needing Alternative Programming" is a disability designation the District uses for a student "with normal intellectual ability [who has] a discrepancy between her measured ability and her demonstrated academic performances."

[2]See generally 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320 (2007).

The ALJ concluded that M.M. was denied a FAPE during the 2003-2004 school year because suspensions from school and the District's failure to review and revise her IEP before she was transferred from Laney to Olson "caused a loss of educational benefit." The ALJ awarded twenty hours of compensatory special education services. The district court reduced the award by eight hours but held that M.M. failed to make adequate progress toward her goals between November 2003 and her transfer to Olson in March 2004, "and the District violated her FAPE rights when it did not review and revise the IEP prior to the transfer."

## A.

In the fall of 2004, L.R. enrolled M.M. at the Colonel Charles Young Military Academy, a charter school not part of the District. However, one month later, L.R. re-enrolled M.M. at Olson. Relying on three prior decisions,[3] the District argues that the ALJ lacked jurisdiction to hear claims from the 2003-2004 school year because, by withdrawing M.M. from the District without first requesting a due process hearing, L.R. waived her right to challenge educational services provided by the District before the withdrawal.

As the ALJ and the district court noted, our prior cases involved students who were no longer attending school in the school district when the due process hearing was requested. Minnesota law then provided that the hearing "be initiated and conducted by and in the district responsible for assuring that an appropriate program is provided." Minn. Stat. § 125A.09, subd. 6 (2000).[4] We therefore held that

---

[3]M.P. ex rel. K. v. Indep. Sch. Dist. No. 721, 326 F.3d 975, 980-81 (8th Cir. 2003); Smith v. Special Sch. Dist. No. 1, 184 F.3d 764, 767-68 (8th Cir. 1999); Thompson v. Bd. of Special Sch. Dist. No. 1, 144 F.3d 574, 578-79 (8th Cir. 1998).

[4]The current statute provides that the hearing "be held in the district responsible for ensuring that a free appropriate public education is provided." Minn. Stat. § 125A.091, subd. 12(a).

"challenges to the student's previous education become moot because the new school district is responsible for providing a due process hearing." Thompson, 144 F.3d at 579. This was a ruling on the merits (failure to state a claim), not a denial of subject matter jurisdiction. Here, M.M. re-enrolled in the District's schools long before L.R. requested the due process hearing. The District's argument that either the ALJ or the district court lacked jurisdiction is without merit.

On the other hand, the ALJ and the district court ignored an additional basis for our decision in Thompson:

> The purpose of requesting a due process hearing is to challenge an aspect of a child's education and to put the school district on notice of a perceived problem. Once the school district receives notice, it has the opportunity to address the alleged problem.

144 F.3d at 579. After M.M. was suspended for assaulting another student and a member of the Laney staff, L.R. left the IEP team meeting convened to consider the problem, did not request revisions to M.M.'s IEP, did not protest the transfer to Olson or request a due process hearing, and then enrolled M.M. outside the District that fall. Though M.M. re-enrolled at Olson shortly thereafter, this sequence of events gave the IEP team and the District no timely notice of a claim that M.M.'s otherwise appropriate IEP should have been revised before her transfer to Olson. The IDEA required the District to revise M.M.'s IEP "as appropriate to address [] any lack of expected progress toward the annual goals and in the general education curriculum." 20 U.S.C. § 1414(d)(4)(A)(ii)(I). Input from L.R. was a critical part of this process. See 34 C.F.R. § 300.324(b)(ii)(C) (effective Oct. 13, 2006), § 300.305(a)(2)(iv) (effective Oct. 30, 2006). In these circumstances, the District may not be held responsible for a failure-to-revise violation in the 2003-2004 school year.

**B.**

Moreover, the ALJ and the district court applied the wrong legal standard in determining that M.M. was denied a FAPE in the 2003-2004 school year. A school district meets its IDEA obligations if the student's IEP is "reasonably calculated to enable the child to receive educational benefits." Hendrick Hudson Dist. Bd. of Ed. v. Rowley, 458 U.S. 176, 207 (1982). An IEP "need not be designed to maximize a student's potential commensurate with the opportunity provided to other children." CJN, 323 F.3d at 638-39 (quotation omitted). Rather, "the requirements of the IDEA are satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit." Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027 (8th Cir. 2003) (quotation omitted); see Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997).

Though M.M.'s November 2003 IEP was appropriate when adopted, the district court upheld the ALJ's conclusion that M.M. "suffered a loss of educational benefit" as a result of the subsequent suspensions and the transfer to Olson. It is doubtless true that any child suffers a loss of educational benefit when suspended, and a transfer caused by serious misbehavior cannot be anything but an educational setback. Yet M.M.'s year-end progress report stated that she made adequate progress on her academic goals during the 2003-2004 school year, and a social worker testified that she made behavioral progress after her transfer to Olson. Compare CJN, 323 F.3d at 642-43. This is not a case like Neosho, where the IEP "did not appropriately address" the student's behavior problem. 315 F.3d at 1028. When a child's primary disability is a behavioral disorder, the school district does not violate IDEA simply because the child failed to achieve the IEP's behavioral goals.

For these reasons, the award of compensatory special education benefits and attorneys' fees for the 2003-2004 school year is reversed.

### III. The 2004-2005 School Year

When M.M. returned to Olson in October 2004, the IEP team met and revised her IEP to increase time spent in special education working toward her math, reading, and behavioral goals. Unfortunately, M.M.'s behavioral issues intensified. She was suspended for disruptive behavior on October 18 and October 26, and for fighting on November 19. In response, the team revised her IEP to increase the amount of time in special education settings. The District completed a new Behavioral Intervention Plan calling for direct daily behavioral instruction, a "point sheet" recording hourly performance that M.M. was to take home each day, and a sequence of increasingly severe sanctions for misbehavior consistent with the District's overall discipline policy. Because M.M. had been suspended for more than ten days, the District also completed a Functional Behavior Assessment that identified multiple incidents of physical aggression threatening the safety of others, noted that negative behavior occurs consistently throughout the school day, and recommended more intensive behavior support and monitoring. See 34 C.F.R. § 300.530(d)(1)(ii) (effective Oct. 13, 2006). Despite these difficulties, two mid-year reports stated that M.M. was making progress in reading, math, writing, and speech, and was "working on" her behavioral goals.

On January 4, 2005, M.M. was suspended for five days for striking a physically handicapped student in the face. The IEP team, including L.R., agreed that M.M.'s placement at Olson was inappropriate and recommended that she be placed in a "Setting III" EBD program, where she would receive services in a separate classroom from a licensed EBD special education teacher and other professionals for at least 60% of the school day. The District offered to provide this program at Jordan Park Community School (Jordan Park). As M.M. was suspended from Olson, the District also offered five hours of homebound instruction, which L.R. rejected as inadequate.

On January 18, the IEP team met at Jordan Park, where Jordan Park representatives explained their Setting III program. L.R. rejected this proposed

placement because of the Jordan Park program's high ratio of male to female students and M.M.'s history of being sexually inappropriate with boys. L.R. asked about the Setting III program for girls at Barton Open School (Barton). The District advised that Barton did not have any openings and offered conciliation or mediation to resolve the change-in-placement disagreement. See 20 U.S.C. § 1415(e); Minn. Stat. § 125A.091, subd. 6-10. L.R. chose mediation.

When M.M. returned to Olson on January 19, her behavior problems continued. On January 21, she was suspended three days for fighting. On February 1, she was suspended four days for having a can of mace at school and assaulting an administrator who tried to take it from her. On February 15, she was suspended four days for assaulting another student. The District again sought L.R.'s permission to implement the proposed IEP placing M.M. in the Setting III program at Jordan Park. L.R. again refused. M.M. was suspended three days for disruptive behavior on February 28, three days for threatening to throw a chair at another student on March 7, and three days for fighting on March 17. The IEP team met on March 9. L.R. did not attend this meeting. The team recommended placing M.M. in the Setting III program at Jordan Park. L.R. again rejected placement at Jordan Park.

The mediation took place on March 28. The parties agreed that M.M. would transition to the W. Harry Davis Academy (Davis), a Setting II placement, while the parties explored the Setting III program at Barton. L.R. made an unscheduled visit to Barton, talked to one teacher, and told the District that the Barton program was not appropriate because it did not sufficiently emphasize academic performance.

M.M. enrolled at Davis on April 11. Before an updated behavioral assessment could be completed, she was suspended five days for using mace while fighting another student. The IEP team proposed that M.M. receive homebound services for the remainder of the school year. L.R. rejected homebound placement and returned M.M. to Davis on May 3. School officials advised that M.M. would be searched each day for weapons. When L.R. objected and removed M.M. from school, the District

threatened a truancy proceeding. M.M. returned to school, cooperated in a non-invasive search procedure, and did quite well at school for the remainder of the school year. L.R. filed a complaint and a request for a due process hearing.

At the hearing, M.M. argued the District denied a FAPE by failing to offer placement in a Setting IV program in a school outside the District. The ALJ rejected this claim, concluding that a Setting III program was the least restrictive environment for M.M. See 20 U.S.C. § 1412(a)(5)(A). The ALJ further concluded that the District denied M.M. a FAPE between January and April 2005 by proposing a change of placement to a Jordan Park program that L.R. and the IEP team had determined was inappropriate; by imposing a pattern of repeated suspensions that constituted a change of placement without parental consent, contrary to IDEA's "stay-put" provision, 20 U.S.C. § 1415(j); and by failing to provide educational services during these suspension periods. The ALJ ordered the District to place M.M. in the Barton Setting III program and awarded her 168 hours of compensatory educational services for the 2004-2005 school year. The district court upheld the award, concluding that the District failed to provide a FAPE between January and April 2005 when it offered M.M. only the Jordan Park Setting III program and repeatedly suspended her in violation of its stay-put obligations. M.M., 2006 WL 2571229 at *26.

The IDEA includes a number of procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." Honig v. Doe, 484 U.S. 305, 311-12 (1988). One of those safeguards is the "stay-put" provision; during the pendency of mediation, a due process hearing, or judicial review, "the child shall remain in the then current educational placement" unless the parent and school officials agree to an interim or permanent change. 20 U.S.C. § 1415(j). In Honig, the Court held that school officials violate the stay-put provision if they unilaterally expel or indefinitely suspend a disabled child for violent or dangerous misconduct. However, the Court approved a Department of Education

-10-

policy that temporary suspensions of ten days or less do not constitute a unilateral change in placement. 484 U.S. at 323-25 & n.8.

## A.

In this case, the IEP team and L.R. agreed in January 2005 that M.M.'s placement at Olson was no longer appropriate; she needed a change of placement to a more structured Setting III program. However, L.R. rejected the District's offer to place M.M. in the Setting III program at Jordan Park. The District then recognized its stay-put obligations by maintaining M.M.'s placement at Olson under the November 2004 stay-put IEP until L.R. agreed to an interim transfer to Davis as part of the mediation agreement. The ALJ and the district court nonetheless concluded that the series of short suspensions totaling more than ten days between January and April of 2005 constituted a change in M.M.'s placement without parental consent that violated the stay-put requirement in 20 U.S.C. § 1415(j).[5] We disagree.

When a parent and the school district's educational professionals agree that a child with a behavioral disability needs a change of placement but cannot agree on an appropriate alternative, the school district must maintain the current, admittedly inappropriate placement under the stay-put IEP until the due process proceedings have concluded, unless the parties agree to an interim alternative placement. See CP v. Leon County Sch. Bd. Fla., 483 F.3d 1151, 1157-58 (11th Cir. 2007). If the child continues to misbehave in ways that endanger herself, other students, or school staff, school officials have the authority under Honig and 20 U.S.C. § 1415(k)(1)(B) to impose suspensions of less than ten days so long as the discipline is consistent with

---

[5]The Department of Education regulations provide that short suspensions that total more than ten days may constitute a unilateral change of placement. See 34 C.F.R. § 300.536 (effective Oct. 13, 2006). "Suspensions exceeding ten days can create a change in placement, but do not necessarily do so." Parents of Student W. v. Puyallup Sch. Dist. No. 3, 31 F.3d 1489, 1495 (9th Cir. 1994).

-11-

school disciplinary policies and the stay-put IEP. Even a "pattern" of such suspensions is not a *unilateral* change of placement. The parties have agreed that a change of placement is needed; only their failure to agree on an interim change, combined with the school district's stay-put obligations, have left the child in a setting that is not successfully controlling her dangerous misbehavior. The ALJ and the district court erred in concluding that the District violated § 1415(j) by complying with its stay-put obligations under that statute.

**B.**

When a disabled child has been suspended for more than ten days without a change in placement, the regulations provide that the child must continue to receive educational services "so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 C.F.R. §§ 300.530(c), (d)(1)(i) (effective Oct. 13, 2006). The ALJ concluded that the District violated this duty by failing to provide M.M. educational services during the days she was suspended between January and April 2005, ignoring the undisputed fact that L.R. rejected the District's offers of home schooling services during this period. This was error. When these suspensions occurred, the parties had already agreed to a change in placement. In that situation, "the child's IEP Team determines appropriate services under paragraph (d)(1)." 34 C.F.R. § 300.530(d)(5). Because the stay-put provision is in effect, the parent must agree to any change in education services. Here, L.R. refused the District's offers of additional home schooling services. The ALJ made no finding that these offers, if accepted by the parent, would not have met the requirements of 34 C.F.R. § 300.530(d)(1)(i) or failed to provide M.M. with a FAPE.

After mediation, L.R. agreed to an interim placement in the Setting II program at Davis, where M.M. almost immediately incurred a five-day suspension for using mace in a fight with another student. After this initial difficulty, the record reflects that Davis provided M.M. "some educational benefit" by the end of the 2004-2005

school year. Thus, as in <u>CP</u>, "we need not consider what course of action a school board *might* take where the then-current placement fails to provide FAPE." 483 F.3d at 1158 (emphasis in original). Even in that difficult situation, the school district should not be liable if the parent, as in this case, has rejected both the offer of an appropriate change-of-placement setting and the offer of interim home schooling services during suspensions authorized by the school's disciplinary policies and consistent with the stay-put IEP.

## C.

Finally, the ALJ concluded that the District denied M.M. a FAPE in March 2005 when it proposed placement in a Jordan Park Setting III program that L.R. and the IEP team had determined was inappropriate. L.R. rejected placement in the Jordan Park program at a January 18 IEP team meeting at Jordan Park. The ALJ's finding that the IEP team agreed with L.R. is dubious at best. One team member, social worker Bill Smart, testified that he attended the January 18 meeting and agreed with L.R. that a boy-dominated Setting III program was not appropriate for M.M. because of her prior sexually inappropriate behavior with boys. However, the January 18 meeting was not attended by four of M.M.'s teachers who were members of the IEP team and who attended a March 9 meeting when the IEP team, in L.R.'s absence, adopted a proposed IEP placing M.M. in the Setting III program at Jordan Park. Smart attended the March 9 meeting, and there is no record that he disagreed with the recommended Jordan Park placement.

Moreover, the record does not support the conclusion that the District denied M.M. a FAPE by proposing the Setting III placement at Jordan Park. M.M.'s prior fights and assaults, and the weapons she brought to school, were the most serious behavioral problems that required a change in placement. All had involved altercations with other girls. While it was reasonable for L.R., the parent of a middle school girl with an emotional and behavioral disability, to be concerned about her sexually inappropriate conduct around boys, M.M.'s history of violent behavior

toward other girls made it reasonable for the District to offer a Setting III placement at Jordan Park, where boys predominated, particularly when there were no immediate openings in the Setting III program at Barton, where girls predominated.

Finally, the record does not support the district court's conclusion that the District violated IDEA because it failed to offer what the ALJ ultimately concluded was the appropriate placement -- the Setting III program at Barton. The March 28, 2005, mediation agreement provided that L.R. would promptly visit Barton to learn about its Setting III program. L.R. made an informal visit a few days later, talked to one teacher, told the District that the Barton program was unacceptable, and later refused to reconsider her decision. With the parent having adamantly rejected a Setting III placement at Barton, the District did not violate the IDEA by failing to offer this placement "formally" before the due process hearing, when the ALJ determined that Barton was a more appropriate placement than L.R.'s more restrictive Setting IV alternative.

After careful review of the record, we conclude that the District did not violate the IDEA when (i) the IEP team including L.R. agreed in January 2005 that a change of placement to a more restrictive setting was needed; (ii) L.R. rejected the placement offered by the District (and by the other members of the IEP team), as well as the District's proposals for interim home schooling; and (iii) the setting proposed by L.R. at the due process hearing was found to be less appropriate for the child than the setting offered by the District and rejected by L.R. See T.F. v. Special Sch. Dist. of St. Louis County, 449 F.3d 816, 821 (8th Cir. 2006). Accordingly, the award of compensatory special education benefits and attorneys' fees for the 2004-2005 school year is reversed.

## IV. Conclusion

The final order of the district court dated September 5, 2006, is reversed.

_____