# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3221

_____

Jonathan Doe, a minor, by Dorothy     *
Doe, his legal guardian and next friend,   *
                                        *
      Plaintiff - Appellee,         *
                                          *
        v.                             *   Appeal from the United States
                                          *   District Court for the
Todd County School District, et al.,      *   District of South Dakota.
                                          *
      Defendants - Appellants.     *
----------------------------------------------- *
South Dakota Advocacy Services, Inc.,   *
                                          *
      Amicus Curiae.             *

_____

Submitted: June 17, 2010
Filed: November 12, 2010

_____

Before LOKEN, BRIGHT, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

In September 2005, Jonathan Doe (a pseudonym to protect his privacy) was a public school student with a reading disability receiving special education and related services at Todd County High School (TCHS) in Mission, South Dakota, as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, and by S.D. Codified Laws Ch. 13-37. After Doe was suspended for fighting and bringing a pocket knife to school, he brought this 42 U.S.C. § 1983 damage action

against the Todd County School District and three school officials (collectively, "the District") claiming that they violated his federal procedural due process rights when his Individualized Education Program (IEP) team placed him in an alternative high school setting for thirty-eight days. Concluding that this action resulted in a "constructive" long-term suspension requiring notice and a hearing before the school board, the district court granted summary judgment to Doe. The District appeals. We conclude that Doe's right to procedural due process was limited to the procedures governing the IDEA decision-maker under 20 U.S.C. § 1415 and therefore reverse.

## I.

On September 8, 2005, Doe fought with another TCHS student on school grounds. The next day, Doe brought a pocket knife to school. When Assistant Principal Michael Berg learned of the fight and called Doe to his office, Doe handed the knife to another student, who promptly turned it in. Questioned by Berg, Doe admitted being in a fight and bringing a knife to school, but said the situation was "fucking bull shit" and walked out when Berg mentioned the possibility of gang activity. After he was returned to Berg's office, Doe grew agitated, spoke loudly enough to be heard outside the office, beat on the walls and windows, and threatened to kill Berg and another teacher. After Doe calmed down, Berg read Doe the school's discipline protocol on short-term and long-term suspensions and called Doe's grandfather and Debera Lucas, the District's Director of Special Education. When they arrived, Berg told Doe and his grandfather that Doe was suspended for fighting and bringing a knife to school. On September 12, Berg wrote Doe's grandparents confirming that Doe was suspended from TCHS from September 8 "until a hearing with the School Board can be arranged."

Under the IDEA, a child with a disability, such as Doe, is entitled to a "free appropriate public education" tailored to his unique needs by means of an IEP. 20 U.S.C. § 1414(d)(1)(A); Hendrick Hudson Central Sch. Dist. Bd. of Ed. v. Rowley,

458 U.S. 176, 181-82 (1982). The IEP is developed, reviewed, and revised by an IEP team that must include the parents of the child, the child's regular and special education teachers, and a knowledgeable representative of the District. See 20 U.S.C. § 1414(d)(1)(B), (d)(3) & (4). Parents must be involved in decisions regarding the educational placement of a child accused of misconduct. 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.501(c). Within ten school days of a decision changing the child's placement because of misconduct, the IEP team must determine whether the misconduct was a manifestation of the child's disability. 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e). A suspension for more than ten days is a change of placement. Honig v. Doe, 484 U.S. 305, 325 n.8 (1988).

Recognizing that Doe's suspension might trigger IEP team obligations, Special Education Director Lucas convened an IEP team meeting on September 13. Doe and his grandmother, Dorothy Doe, the parent member of the team, attended. The IEP team first determined that Doe's misconduct was not a manifestation of his disability. Then, consistent with the Behavior Intervention Plan adopted in November 2004 to remedy Doe's prior failures to obey school rules of conduct, the IEP team adopted, with Dorothy Doe's written approval, an IEP Addendum. The Addendum changed Doe's placement to an after-school program at the Alternative High School located one block from the high school, where he would receive two hours of regular and special education tutoring per day until he could be "transitioned" back to TCHS. Before his suspension, Doe received five hours of general education instruction and one hour of special education per day at TCHS. After the IEP team meeting, Lucas told Berg that Doe was "no longer under suspension" because his placement had been changed. Dorothy Doe testified that she agreed to the change of placement "because there was no alternative for him to go back to the regular classroom."

On September 21, Dorothy Doe wrote Berg advising that Doe had now been suspended ten days. She requested a hearing before the school board unless Doe was returned to TCHS the next day. Berg responded on September 29 that the suspension

ended on September 13 when the IEP team changed Doe's placement to the After School Program. Therefore, "there is no long-term suspension presently in effect which could result in an appeal to . . . and hearing before the school board."

On October 11, Dorothy Doe wrote Lucas complaining that two hours of daily instruction at the After School Program denied Doe the free appropriate public education afforded by the IDEA and requesting that his placement be changed. The IEP team met the next day and agreed to complete behavioral rating scales before beginning Doe's transition back to TCHS. In response to an October 21 letter from Doe's attorney, Lucas wrote Dorothy Doe on October 27, reiterating that Doe was not suspended, that the After School Program "was selected as an appropriate interim alternative educational setting," that Dorothy Doe had agreed to the change-of-placement, and that Doe would be transitioned back to TCHS on or about October 31.

Doe returned to TCHS on November 3, 2005. He was suspended for ten days for fighting in late November. The Does removed him from TCHS in early 2006 and filed this § 1983 lawsuit in June 2007 without seeking relief under the IDEA.

## II.

In Goss v. Lopez, 419 U.S. 565 (1975), the Supreme Court considered the extent to which the Due Process Clause of the Fourteenth Amendment applies to disciplinary suspensions of public school children. The Court concluded that "a student's legitimate entitlement to a public education" is protected by the Due Process Clause, id. at 574, and required, for the ten-day suspension at issue, that the suspended student be provided "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581. The Court cautioned that longer suspensions "may require more formal procedures," such as the right to counsel or to cross-examine witnesses. Id. at 584. Though the Court has not since addressed what

additional process may be required for longer suspensions, ten days has become the statutory benchmark for distinguishing short- and long-term suspensions, see 20 U.S.C. § 1415(k)(1)(B); S.D. Admin. R. 24:07:01:01(2), (5), and federal appellate courts have applied the balancing test of Mathews v. Eldridge, 424 U.S. 319 (1976), to determine what additional process may be due. See Watson v. Beckel, 242 F.3d 1237, 1240 (10th Cir. 2001) (collecting cases).

Here, the District argues that Doe was suspended four days, from September 8 to 13, 2005. If correct, Doe's § 1983 due process claim must fail because a four-day suspension triggers only the limited due process requirements set forth in Goss, 419 U.S.C. at 581. Principal Berg met those requirements by explaining the charges to Doe and giving Doe an opportunity to respond, speaking with Doe's grandfather about the charges, and writing the September 12 letter to Doe's grandparents. See Jennings v. Wentzville R-IV Sch. Dist., 397 F.3d 1118, 1124 (8th Cir. 2005).

Doe argues, on the other hand, that his suspension continued until he returned to TCHS on November 3, making it a long-term suspension entitling him to more procedural due process, including formal notice and a hearing before the school board. The district court agreed, concluding that the reduced quality and quantity of classroom instruction Doe received at the After School Program resulted in a "constructive" suspension that lasted thirty-eight days. Relying on its prior opinion in Waln v. Todd County Sch. Dist., 388 F. Supp. 2d 994 (D.S.D. 2005), the court held that the District violated the Due Process Clause by failing to provide Doe with the formal notice and school board hearing required by South Dakota Department of Education Administrative Rules. See S.D. Admin. R. 24:07:03:02. We review the district court's due process analysis and grant of summary judgment *de novo*. Jennings, 397 F.3d at 1122.

In our view, the district court erred in focusing its due process analysis on the number of days Doe was removed from regular classes at TCHS. Without question,

<u>Goss</u> makes clear that Doe's removal from his public school for misconduct entitled him to Due Process Clause protection, in addition to procedural protections provided by the IDEA. <u>See</u> <u>Digre v. Roseville Schs. Indep. Dist. No. 623</u>, 841 F.2d 245, 249-50 (8th Cir. 1988). But as a matter of federal law -- the IDEA as well as the Due Process Clause -- the critical question is, who was the decision-maker responsible for affording Jonathan and Dorothy Doe whatever process was due?

### III.

After the IEP team determined on September 13 that Doe's misconduct was not a manifestation of his disability, the IDEA gave the team two significantly different procedural alternatives for dealing with the situation. First, the team could have let school officials apply generally applicable disciplinary procedures and suspend Doe "in the same manner and for the same duration in which the procedures would be applied to children without disabilities . . . ." 20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(c). This would result in a purely disciplinary proceeding to which the due process protections of <u>Goss</u> and the South Dakota Administrative Rules would apply, as in <u>Waln</u>, 388 F. Supp. 2d at 1000, a case that did not involve a student with an IEP. If school officials unilaterally (i.e., without the parent's consent) remove a disabled child for more than ten days, the child must "continue to receive educational services . . . so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 20 U.S.C. § 1415(k)(1)(D)(i); 34 C.F.R. §§ 300.530(d), 300.536(a). The IDEA expressly authorizes school officials to unilaterally remove a student "to an interim alternative educational setting for not more than 45 school days" if the child "carries or possesses a weapon to or at school . . . ." 20 U.S.C. § 1415(k)(1)(G)(i); 34 C.F.R. § 300.530(g).[1]

---

[1]"Weapon" means a "dangerous weapon" as defined in 18 U.S.C. § 930(g)(2). 20 U.S.C. § 1415(k)(7)(C). Doe's knife may not have met that definition.

Alternatively, the IEP team could act more affirmatively, as Doe's did in this case, by changing the disabled child's placement from the school which suspended him to an alternative educational setting. However, under 20 U.S.C. § 1415(j), the IDEA's "stay-put" provision -- an important procedural safeguard -- the IEP team could not take this action without the parent's consent. See M.M. v. Special Sch. Dist. No. 1, 512 F.3d 455, 463 (8th Cir.), cert. denied, 129 S. Ct. 452 (2008), applying Honig, 484 U.S. at 323-25. A change of placement, often to a more structured educational setting, may be triggered by the child's violation of the school's code of conduct, but it is primarily an educational, not a disciplinary, decision. See M.M., 512 F.3d at 464-65; Ind. Sch. Dist. No. 284 v. A.C., 258 F.3d 769, 776-77 (8th Cir. 2001). Here, taking account of Jonathan Doe's prior history of behavioral misconduct, the IEP team with Dorothy Doe's consent changed Doe's placement to the After School Program for the purpose of providing services -- counseling as well as instructional -- that would help transition him back to regular classes at TCHS. The IDEA expressly provides that any interim alternative educational setting "shall be determined by the IEP Team." 20 U.S.C. § 1415(k)(2); 34 C.F.R. §§ 300.530(d)(5), 300.531. Doe's 2004 Behavioral Intervention Plan provided that, if a future suspension should exceed ten days, the alternative educational setting to be used was "after school tutoring at the Alternative High School."

Once the IEP team changed Doe's placement with Dorothy Doe's consent, the IEP team, not the school board, became the decision-maker authorized to change his placement again. See 34 C.F.R. §§ 300.530(d)(5). Given the IDEA's stay-put mandate, even if the District had held a Goss hearing at which Doe persuaded the school board that a long-term suspension was not warranted, the board could not have ordered Doe's reinstatement at TCHS. M.M., 512 F.3d at 464. "The fundamental requirement of due process is the opportunity to be heard at a *meaningful* time and in a *meaningful* manner." Mathews, 424 U.S. at 333 (emphases added; quotation omitted); see Mackey v. Montrym, 443 U.S. 1, 16 (1979) (the Due Process Clause does not require process that "would be an exercise in futility"). Viewed from a

different perspective, all but four days of the deprivation on which Doe's due process complaint is based was the result of an IEP team decision to which Dorothy Doe consented. Whether or not the removal is characterized as a "constructive" long-term suspension, the school board could not remedy the deprivation and therefore was not constitutionally required to conduct a meaningless due process hearing. Pointless process is never due.

This result does not mean the Does were without an effective procedural remedy. As the Supreme Court explained in Honig, 484 U.S. at 311-12, the IDEA:

> establishes various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate. These safeguards include . . . prior written notice whenever the responsible educational agency proposes (or refuses) to change the child's placement or program; an opportunity to present complaints concerning any aspect of the local agency's provision of a free appropriate public education; and an opportunity for 'an impartial due process hearing' with respect to any such complaints. [20 U.S.C.] §§ 1415(b)(1), (2).

In this case, although Dorothy Doe consented to the change of placement at the September 13 IEP team meeting, on further reflection she decided her consent was improperly obtained, and she further concluded that Doe's limited instruction at the After School Program failed to provide him a free appropriate public education. Both claims could have been raised in an IDEA complaint seeking Doe's immediate return to TCHS and compensatory education benefits for the inadequacies of his alternative placement. See 20 U.S.C. §§ 1415(b), (f) - (i). The IDEA expressly provides for expedited administrative hearings in this situation, see 20 U.S.C. § 1415(k)(4)(B), and the statute's stay-put provision "in no way purports to limit or pre-empt the [remedial] authority conferred on courts by [20 U.S.C. § 1415(i)(2)(C)(iii)]." Honig, 484 U.S. at 327. Even when the parent initially agrees to a change of placement, an

administrative hearing officer or reviewing court may later conclude that the consent was not validly obtained, or that the IEP team failed to provide services under 34 C.F.R. § 300.530(d) that afforded the child a free appropriate public education in the alternative educational setting. See M.M., 512 F.3d at 464.

State hearing officers, and courts reviewing their decisions under the IDEA, have broad discretion to order educational relief, including compensatory education benefits. See, e.g., Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14 (1993); Kutasi v. Las Virgenes Unified Sch. Dist., 494 F.3d 1162, 1169-70 (9th Cir. 2007). However, the IDEA left "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." Rowley, 458 U.S. at 207.

We have little doubt that, at the IEP team meeting on September 13, 2005, Dorothy Doe did not believe she could veto decisions being made by other members of the team. But it is undisputed that she signed a document agreeing to a change of Jonathan's placement that gave the IEP team, rather than the District's school board, control of the situation. Some days later, unhappy with the results of that decision and represented by attorneys with experience in this kind of dispute, Dorothy demanded the wrong procedural remedy, a hearing before the school board, and then commenced this § 1983 action. This was not merely a failure to exhaust IDEA procedural remedies, which the IDEA requires before a § 1983 action may be filed. See 20 U.S.C. § 1415(l). Doe's procedural due process complaint was not primarily about being disciplined for misconduct. It was about the effect of the disciplinary action on his right to a free appropriate public education after he was excluded from regular mainstream classes and had his weekly classroom instruction substantially reduced by his IEP team. Because the school board lacked authority to overrule educational decisions of the IEP team, however, the District's refusal to convene a school board hearing did not violate Jonathan Doe's federal constitutional right to procedural due

process.  Rather, the IEP team's educational decision must be reviewed in accordance with the extensive -- and constitutionally adequate -- procedural safeguards of the IDEA.  The Does were fully aware of those safeguards but declined to invoke them.[2]

The judgment of the district court is reversed.

_____

[2]The record establishes that Doe received a copy of his procedural safeguards at the September 13 IEP team meeting.  Moreover, in 2004, Doe disagreed with an IEP team decision and appealed that decision to an IDEA mediation proceeding.