# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-3444

_____

D. L., by next friend Frances Landon, by next friend MollyJayne Landon

*Plaintiff - Appellant*

v.

St. Louis City School District

*Defendant - Appellee*

_____

No. 18-3497

_____

D. L., by next friend Frances Landon, by next friend MollyJayne Landon

*Plaintiff - Appellee*

v.

St. Louis City School District

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 11, 2019
Filed: March 2, 2020

_____

Before ERICKSON, MELLOY, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

D.L., through his parents, brought an Individuals with Disabilities Education Act ("IDEA") due process challenge to the St. Louis City School District's individual education plan and school placement before the Missouri Administrative Hearing Commission ("AHC"). D.L.'s parents sought reimbursement for a private placement based on the alleged IDEA violations. The AHC affirmed the plan and placement and denied reimbursement. D.L. appealed to the district court, which reversed the AHC but limited the reimbursement award based on equitable considerations. We have jurisdiction under 28 U.S.C. § 1291. Because we find that the school district violated the IDEA and the district court erred in limiting the award, we affirm in part and reverse in part.

## I. Background

### A. Medical and Educational History

D.L. is a thirteen-year-old boy with medical diagnoses of autism spectrum disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder, disruptive mood regulation, encopresis, and enuresis. As a result of the latter two conditions, D.L. has toileting issues. He may also suffer from fetal alcohol syndrome. D.L.'s individual education plans ("IEPs") note his medical diagnoses and provide an educational diagnosis of other health impairment ("OHI"). D.L. was neglected, likely abused, fostered at age five, and lived with eight families before he was

adopted in 2015. Since kindergarten, D.L. has displayed disruptive and alarming behaviors at school. At times he hits, scratches, kicks, and bites himself and others, screams, refuses activities, soils his pants, makes animal noises, threatens to kill himself and others, and runs away from school.

D.L.'s educational history is complex. He attended kindergarten and first grade at Epworth City School, a private separate placement in the St. Louis City School District ("the District"). D.L. was first involved in a sensory diet in the first grade, shortly after he was diagnosed with autism. A sensory diet is a regime under which the student is given regular periodic preemptive stimulation during the day in order to help regulate behavior. D.L. was hospitalized in January 2014 due to recurring suicidal and homicidal ideation. His April 2014 IEP contained his medical diagnoses, referred to his educational diagnosis, and emphasized the importance of a therapeutic environment, sensory support throughout the day, and added occupational therapy ("OT"). D.L.'s autism diagnosis was also confirmed in April 2014 at Mercy Children's Hospital's Autism Center. D.L. was once again hospitalized between May 18 and June 5, 2014, for suicidal ideations following an attack on his teacher.

In second grade D.L. was moved to Mullanphy Elementary School, a public school for students with educational disabilities. At Mullanphy D.L. was placed in a classroom for students with autism and provided daily sensory supports. Even though D.L. continued to have behavioral issues, he did better under the new regime and his outbursts decreased from 5-7 to 2-3 times per week. D.L. was not hospitalized in the second grade and developed a love for reading. He did, however, begin self-stimulating behaviors this year, which are common in people suffering from autism and include such things as repetitive hand gestures, rocking, repeating words or phrases and the like. D.L.'s parents sought to have his educational diagnosis changed to reflect his medical diagnosis of autism but the District resisted, claiming that his language and verbal scores were too high for an educational

diagnosis of autism even though the IEP continued to include his medical diagnosis of autism.

During the third grade D.L. was placed in a cross-categorical classroom for students with differing educational disabilities and his condition deteriorated substantially. D.L. was hospitalized four times in third grade for reasons including self-harm, cognitive regression, and assaultive behaviors. He also regressed with his toileting and needed to be placed back in pull-ups. D.L.'s third grade IEP notes memorialized his regression during the year but failed to mention his hospitalizations.

The District continued with D.L.'s placement in a cross-categorical classroom in the fourth grade with disastrous results. D.L. only managed to attend school for seven days, which were marked by attacks on classmates and staff and self-harm. D.L. had particular difficulty with stimulation surrounding the beginning and end of the school day. In order to minimize the problem, D.L.'s parents dropped him off late and picked him up early each day to avoid the noise of pickup and drop-off. For three of these seven days D.L. attended school he was accompanied by a therapist. During this time D.L. also refused sensory support and continued self-stimulating behaviors. Because of the problems at school, D.L.'s initial IEP meeting was cancelled. D.L.'s parents placed him in treatment at Great Circle, a school and residential facility for educationally disabled children. When D.L. began residential treatment at Great Circle, the District disenrolled him without notifying his parents.

D.L.'s residential treatment at Great Circle was a medical necessity. He attended a classroom program for children with autism from September 6, 2016, to November 11, 2016. His teacher had a provisional special education certificate, but had never taught in a classroom for educationally disabled children and had little experience with the sensory needs of children with autism. While D.L. had access to sensory supports and OT at Great Circle and participated for the first two weeks, he thereafter refused the supports. When upset, D.L. would slam his head against walls

-4-

and doors. His Great Circle teacher, upon D.L.'s parents' advice, began to ignore the head-slamming and noticed that it dissipated more quickly when ignored. Based on this behavior and refusing sensory supports, the teacher concluded that D.L. had no sensory needs and his behavior was wholly attention-seeking. Notwithstanding this belief, D.L. continued to engage in self-stimulating behaviors.

As the time approached for D.L.'s discharge from Great Circle, his parents contacted the District hoping to construct an IEP that implemented many of the promising strategies used by Great Circle with a goal of continuing D.L.'s upward trajectory. Instead, D.L.'s parents discovered that he had been disenrolled and that Mullanphy did not have adequate staff or space for him to return. The District informed his parents that, because D.L. was not enrolled and his prior IEP did not expire until March 2017, they would not schedule an IEP meeting. Eventually, the District relented and agreed to re-enroll D.L. on November 7, 2016, and hold an IEP meeting for him the same day.

D.L.'s fourth grade teacher drafted an IEP in connection with the November 7 meeting. On the same day that D.L.'s teacher provided a meeting notice to D.L.'s parents, they provided the District with a detailed educational history for D.L., including his psychiatrist's recommendations for D.L.'s future school placement. D.L.'s psychiatrist is the director of the Division of Child Psychiatry at Washington University's School of Medicine. At the time of the hearing, he had five-years' experience with D.L. and had treated over one thousand children with autism since 1990. The psychiatrist's letter recommended that D.L. receive a proactive sensory diet and full-time direct OT at a program addressing autism rather than general educational disability.

The IEP team convened and discussed possible placement at Great Circle but eventually voted against it after Great Circle staff suggested it would not be an appropriate placement. Instead the IEP team decided to eliminate all direct OT from

D.L.'s IEP and, two and a half hours into the meeting, voted to place D.L. at Educational Therapeutic Support at Madison ("Madison"), a school for children with educational and behavioral difficulties. After the vote to send D.L. to Madison, his parents provided the District a note explaining their intention to seek private education at public expense and left the meeting. D.L.'s November 2016 IEP contained a near-verbatim recitation of his behavior description from previous IEPs, ignoring the improvement in his behavior while at Great Circle. The IEP goals also remained substantially the same, despite his medically-necessitated residential treatment and inability to complete more than seven days at Mullanphy.

On November 10, D.L.'s parents requested the IEP in preparation for a meeting with D.L.'s psychiatrist to plan next steps. On November 16, they toured Madison with its principal. They were accompanied by a licensed clinical social worker from the city. D.L.'s parents and the social worker felt Madison was not a proper placement for D.L. Madison had no students with autism or toileting issues, no sensory room or other autism-focused supports and resources, its staff and principal were unfamiliar with the sensory and educational needs of students with autism, and the school aimed to reform students with voluntary behavioral issues rather than behavior symptomatic of an underlying medical condition. D.L.'s parents were particularly concerned that Madison's "recovery room," the closest resource resembling a sensory room, was used as a punishment when students misbehaved rather than as a therapeutic resource.

At this time, D.L.'s parents were also exploring the possibility of sending him to Giant Steps, a private school providing therapeutic education for students with autism. On November 14, D.L.'s parents submitted an application and vaccination records to Giant Steps. D.L. then participated in a three-day trial visit to Giant Steps. On December 5, 2016, D.L.'s parents submitted a payment authorization to Giant Steps and D.L. began attending the same day.

*B. Procedural History*

On November 18, 2016, D.L.'s parents filed a due process complaint alleging the District violated the IDEA when the District approved the November 2016 IEP and placed him at an inappropriate school, Madison, thereby denying D.L. a free appropriate public education ("FAPE"). The AHC held a hearing and received the testimony of District employees, Great Circle staff, one of D.L.'s parents, D.L.'s psychiatrist, Madison's principal, and others familiar with D.L.'s medical and educational history. By the time the hearing was held, Madison had constructed a sensory room and admitted three students with medical diagnoses of autism. The AHC held that the IEP and placement complied with the IDEA's promise of a FAPE.

D.L. appealed the AHC's decision to federal district court. The district court found that D.L. was denied a FAPE when his direct OT was eliminated and he was placed at Madison. The district court limited the tuition reimbursement, only awarding reimbursement for D.L.'s attendance before the AHC hearing, "when Madison had no autism-related sensory supports." D.L. continued to attend Giant Steps after the AHC hearing, but the AHC hearing presented the first evidence that Madison had constructed a sensory room and admitted students with a medical diagnosis of autism. At that point the district court found that Madison was an appropriate placement for D.L. D.L. moved for an amended judgment granting tuition reimbursement in full and the district court denied the motion.

D.L. appeals the district court's decision seeking full tuition reimbursement. The District cross-appeals, asserting five points of error: (1) the AHC and district court lacked jurisdiction over the due process complaint; (2) the issue of prospective relief is now moot; (3) the district court misstated the burden of proof at the AHC hearing; (4) the district court erred in finding the District denied D.L. a FAPE; and (5) the district court erred in finding Giant Steps is an appropriate placement for D.L.

## II. Analysis

### A. Jurisdiction, Mootness, and Burden of Proof

Before reaching the merits of the FAPE denial and reimbursement, we will briefly address the District's three procedural challenges. We review issues of subject matter jurisdiction, including mootness, *de novo*. Davis v. Anthony, Inc., 886 F.3d 674, 677 (8th Cir. 2018). Proper allocation of the burden of proof is also a legal issue subject to *de novo* review. Scenic Holdings, LLC v. New Bd. of Trs. of Tabernacle Missionary Baptist Church, Inc., 506 F.3d 656, 666 (8th Cir. 2007).

The District first contends that the AHC lacked jurisdiction over D.L.'s due process claim because D.L. was enrolled at Giant Steps prior to the commencement of the due process challenge. The right to challenge prior educational services is forfeited when a student changes school districts prior to requesting a due process hearing. Thompson v. Bd. of Special Sch. Dist. No. 1, 144 F.3d 574, 579 (8th Cir. 1998). The rule is intended to provide the school district with notice and an opportunity to address the problem. Id. Where a student remains enrolled within the school district at the time of the complaint, an argument that jurisdiction is lacking under Thompson is without merit. M.M. ex rel. L.R. v. Special Sch. Dist. No. 1, 512 F.3d 455, 460 (8th Cir. 2008).

D.L. was enrolled in the District on the day of his November 2016 IEP meeting. At that meeting his parents gave notice that they would seek private education at public expense by providing a note to the District. In the eleven days between that meeting and the due process complaint, D.L.'s parents worked toward transitioning D.L. to Giant Steps but did not enroll him or enter into any payment agreement. At the same time, they requested a copy of the November 2016 IEP and toured Madison with its principal just two days before filing the due process complaint. The record reflects that when D.L.'s parents filed their complaint: (1) D.L. was still enrolled

with the District; (2) he had not yet enrolled at Giant Steps; and (3) his parents had already provided notice to the District at the November 2016 IEP meeting. Thompson is inapplicable under the facts of this case and the District's jurisdictional challenge is without merit.

The District next contends D.L.'s claims for prospective relief are moot because he now resides outside the District. The District misapprehends the claims before us. D.L. is making no claim for prospective relief, rather he seeks only compensation for past obligations incurred while he resided in the District. Such claims may be sought after a student leaves a school district. Independent Sch. Dist. No. 284 v. A.C., 258 F.3d 769, 774-75 (8th Cir. 2001). The District's mootness challenge also fails.

The District's final procedural challenge is that the district court erred in reciting the burden of proof before the AHC. It is indisputable that the party seeking relief carries the burden of proof in an administrative hearing challenging an IEP. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005). In this case, D.L.'s parents sought relief before the AHC and therefore carried the burden of proof throughout the administrative hearing. The district court stated: "During the state administrative proceedings, the school district has the burden of proving that it complied with the IDEA. On appeal to federal court, the party challenging the outcome of state administrative hearings has the burden of proof." The district court erroneously described the burden of proof at the AHC hearing. Placing the burden of proof on the incorrect party in an IDEA due process challenge is reversible error unless the issue is immaterial. M.M. ex rel. L.R., 512 F.3d at 459. Though the district court misstated the burden applied in the prior AHC hearing, it also correctly stated that it must "give due weight to the results of the administrative process below." The misstatement of law in this case was immaterial. The statement did not assign a burden of proof, it incorrectly described a past proceeding. The district court properly placed the burden on D.L. in the proceeding before it and correctly stated the

standard of review on appeal. Any error in inaccurately describing the burden of proof before the AHC is harmless under these circumstances.

## B. Denial of FAPE

We review *de novo* whether the District provided D.L. with a FAPE, affording due weight to the outcome of the AHC's decision and accepting the district court's factual findings as true unless they are clearly erroneous. Albright v. Mountain Home Sch. Dist., 926 F.3d 942, 948 (8th Cir. 2019).

Schools receiving federal funding must provide qualifying disabled children with a FAPE tailored to meet the unique needs of the disabled child. Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir. 1999) (citing 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A)). A FAPE does not necessarily fit precise parental preferences, maximize a student's potential, or provide the best possible education at public expense. Id. Rather, it must provide a student with "some educational benefit" consistent with the goals of their specific IEP. Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 200, 203 (1982). The IEP itself must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017).

The AHC's findings actually establish that placement at Madison would not provide D.L. with a FAPE. The AHC found: (1) Madison's principal was not very familiar with autism; (2) at the time D.L.'s parents toured Madison it had no students with autism and no autism-specific resources; (3) Madison staff had no experience dealing with toileting issues; and most strikingly (4) "a student who has no control over his behaviors would not benefit from instruction at Madison." One of the hallmarks of autism is that the behavioral issues associated with it are involuntary. The AHC found Madison could not benefit a student with involuntary behavioral

issues while simultaneously finding that the IEP "acknowledged [D.L.'s] medical diagnosis of autism and addressed his autistic needs." The District cannot provide D.L. with a FAPE based on an acknowledgment of his medical diagnosis of autism by placing him in a school limited to correcting purely voluntary behavior.

Madison's principal testified that he was unfamiliar with autism and that Madison would not be appropriate if D.L.'s autism-driven behavior was involuntary. His testimony describes Madison as "a school for behavior" for children who have made "poor choices" to learn to "discipline themselves." The principal testified that Madison aims "to be that activated charcoal, take those impurities out so we can have a better student" because in "the real world . . . [n]obody's going to care if you're autistic." We do not disparage the important work the principal and Madison staff do to help their students with behavioral issues. Many children with such issues would benefit from the program at Madison. In fact one of D.L.'s parents testified that she respected the principal and felt Madison would be a great placement for some other children she had fostered. But D.L. required a school equipped to manage his medically-diagnosed autism, not placement in a school designed to correct "poor choices" resulting in bad behavior.

The AHC upheld placing D.L. at Madison and eliminating his direct OT after hearing testimony from Great Cirlce staff that: (1) some of D.L.'s behavior was attention-seeking or in response to non-preferred activity, and (2) D.L. at times refused sensory items. Specifically, one of D.L.'s teachers testified that D.L. did not have significant sensory needs and that his difficulty completing class work was mainly manipulative and attention-seeking. The behavior that the teacher specifically pointed to in support of her thesis was D.L.'s head-banging, which would subside when ignored.

That D.L. engaged in some misbehavior for attention does not negate the undisputed fact that other behaviors he engaged in, such as self-stimulation, are

involuntary and autism-driven. It is inconsistent with the IDEA's promise of a FAPE for the District to conclude that an eight-year-old's occasional attention-seeking behavior is sufficient to negate years of medical diagnoses, recommendations, IEPs, and other indicia that D.L.'s problems are undisputedly autism-driven behaviors. The AHC questioned whether D.L.'s tendency to act out in response to non-preferred activity was, as Great Circle staff believed, voluntary and attention-seeking behavior or, as D.L.'s psychiatrist opined, symptomatic of medical conditions. Both the psychiatrist's testimony and D.L.'s original autism evaluation support a conclusion that D.L.'s condition deteriorated when he transitioned to a non-preferred activity. This does not render D.L.'s behaviors voluntary rather than autism-driven. Rather, this deterioration is entirely consistent with autism.

Great Circle staff also concluded D.L. did not have sensory needs because he declined sensory supports in the final three weeks of his five-week stay at Great Circle. All children, including those with autism, sometimes refuse things they need. This rejection does not diminish the need, rather it demonstrates that sometimes children are not the best judges of what is good and necessary for them. Sensory support is treatment, not an activity. An ill child may not prefer the taste of medicine and resist taking it, but that does not mean that the medicine is unnecessary. D.L.'s reluctance to engage with sensory supports for a three-week period is insufficient evidence to determine that he does not need sensory supports. By contrast, his documented sensory needs have been recorded for years in his IEPs, multiple medical diagnoses, and the recommendations of his doctor. The District denied D.L. a FAPE as required by the IDEA when it placed him at Madison without direct OT or a sensory diet plan in place to address his autism-related issues.

## C. Giant Steps and Reimbursement

D.L. must establish that Giant Steps is an "'appropriate' placement within the meaning of the IDEA" in order to receive reimbursement for tuition there. Sneitzer

v. Iowa Dept. of Educ., 796 F.3d 942, 948 (8th Cir. 2015) (quoting Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 242-43 n.9 (2009). Because the AHC made no findings on Giant Steps' appropriateness, the district court reviewed *de novo* and found it was an appropriate placement. We review the district court's decision *de novo*. C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, 636 F.3d 981, 989 (8th Cir. 2011).

Giant Steps was an appropriate placement for D.L. Giant Steps provided D.L. sensory and speech support, weekly OT, autism-focused resources and experienced staff, and a personalized education to successfully keep him in class. D.L. made academic progress at Giant Steps, which we have found is a significant factor in determining an appropriate placement. See CJN v. Minneapolis Pub. Schs., 323 F.3d 630, 642 (8th Cir. 2003) ("[T]he fact that [a student] is learning is significant evidence that [their] behavioral problems have . . . been attended to."). Because Giant Steps was an appropriate placement for D.L., we turn to D.L.'s parents' request for reimbursement for private tuition.

When a school district fails to provide a FAPE, "parents [have] a right of unilateral withdrawal and a right to reimbursement for private tuition, so long as the placement was proper under the [IDEA] and the award furthers the purposes of the Act." C.B. ex rel. B.B., 636 F.3d at 991 (cleaned up). The IDEA permits federal district courts to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). A district court may calculate an appropriate amount of reimbursement based on relevant equitable considerations. Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993). We review the district court's denial of reimbursement *de novo* giving due weight to the AHC's findings. T.F. v. Special Sch. Dist. of St. Louis Cty., 449 F.3d 816, 818 (8th Cir. 2006).

The district court crafted its award limitation based on Madison constructing a sensory room and admitting three students with autism. The district court denied reimbursement for D.L.'s attendance after Madison's principal's testimony that those

-13-

improvements were made. We conclude that an award limitation based on improvements to Madison is inappropriate and inconsistent with the purposes of the IDEA because the District failed to give any notice to D.L.'s parents. When D.L.'s parents toured Madison, the school had no autism-focused resources or sensory supports and no students with autism attending. By the time of the AHC hearing, Madison had built a sensory room and enrolled three students with a medical diagnosis of autism. It is undisputed that the District did not provide notice of these improvements.

Limiting an award based on improvements not communicated to D.L.'s parents is inconsistent with the IDEA's purpose. This standard would place an unfair obligation on parents justified in seeking tuition reimbursement, contrary to the IDEA's purposes of protecting the rights of parents who seek appropriate educational services for their disabled children. 20 U.S.C. §§ 1400(d)(1)(A), 1400(d)(1)(C). Imposition of this standard would require parents to constantly monitor schools inappropriate for their children in anticipation of the first improvement that could conceivably provide an academic benefit. In this case those improvements took months. In other cases they could take much longer.

Testimony at the AHC hearing from Madison's principal did not provide sufficient notice to the parents that they risked reducing eligibility for tuition reimbursement if they continued D.L.'s enrollment at a private school. Determining the amount of tuition reimbursement based on a school principal's testimony about a sensory room, without the District holding an IEP meeting, another vote on placement at Madison, or even offering D.L.'s parents another opportunity to tour Madison does not comport with the purposes of the IDEA. The principal merely testified that Madison had a sensory room and students with autism. This was insufficient notice arising in the midst of litigation before a state administrative hearing officer. Moreover, there is no evidence that D.L.'s parents have been informed of how the three enrolled students with autism are faring at Madison,

-14-

whether the sensory room is being used as therapy or punishment, or whether Madison has obtained other necessary autism-related resources and staff. Because the District failed to notify D.L.'s parents of any improvements to Madison, we decline to limit tuition reimbursement.

## III. Conclusion

For the foregoing reasons, we affirm in part and reverse in part. We affirm the district court's holding that the District violated the IDEA when it denied D.L. a FAPE by eliminating his direct OT and placing him at Madison. We reverse the district court's limitation of tuition reimbursement and award full tuition reimbursement to D.L. for his attendance at Giant Steps.

———————————————